# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# SHREVEPORT DIVISION

| | |
|---|---|
| SHREVEPORT CHAPTER #237 OF UNITED DAUGHTERS OF THE CONFEDERACY | CIVIL ACTION NO. 17-1346 |
| VERSUS | JUDGE ROBERT G. JAMES |
| CADDO PARISH COMMISSION, ET AL. | MAG. JUDGE MARK L. HORNSBY |

# RULING

On October 19, 2017, Plaintiff Shreveport Chapter #237 of the United Daughters of the Confederacy ("UDC") filed a Complaint [Doc. No. 1], which contained a motion for a preliminary injunction. In its supporting memorandum [Doc. No. 10], UDC clarified that it seeks a temporary restraining order ("TRO") and a preliminary injunction. UDC moves the Court to enjoin Defendants Caddo Parish Commission ("the Commission") and individual Commissioners Lyndon B. Johnson, Steven Jackson, Matthew Linn, Jerald Bowman, Lynn D. Cawthorne, Stormy Gage-Watts, and Louis Johnson (jointly "the Commissioners") from removing the Confederate Monument currently located at the Caddo Parish Courthouse Square[1] and requiring them to provide security, in the form of a cash bond or insurance policy, sufficient to protect UDC's rights.

A conference was held on October 23, 2017, during which the Court set a hearing on the motion for preliminary injunction for December 11, 2017.

Prior to the hearing, the Commissioners moved for dismissal of the claims against them.

---

[1] UDC did not bring suit against the individual Commissioners who voted against the removal of the Confederate Monument.

[Doc. No. 11]. UDC opposed the motion [Doc. No. 17] and also sought entry of default and default judgment against the Commission [Doc. Nos. 26 & 27]. The Commission moved for leave to answer and set aside the default [Doc. No. 29].

On December 11, 2017, after hearing from counsel in a conference and open court, the Court granted the Commissioners' Motion to Dismiss. The Court then heard evidence from the parties on UDC's motion for a preliminary injunction. At the conclusion of the hearing, the Court took the motion under advisement.

That same day, the Court issued an order granting the Commission's motion to file its answer [Doc. No. 34] and denying UDC's motion for entry of default and for entry of default judgment as moot. [Doc. No. 36].

Having considered the testimony, the evidence, and the argument of counsel, the Court issues this Ruling.

## I. FINDINGS OF FACT

The Court finds the following facts to be established:

In 1835, the United States acquired the lands which constitute Caddo Parish in a treaty signed with the Caddo Indians.

Since the 1840's, Caddo Parish has used Block 23, City of Shreveport, for public purposes. A courthouse, maintained by Caddo Parish, has sat on the same property since 1860.

In 1896, UDC's Shreveport Chapter was organized.

On June 18, 1903, the Caddo Parish Police Jury, the predecessor to the Commission, held a meeting. The minutes of that meeting state as follows:

The rules were suspended and Mr. W.H. Wise on behalf of the Daughters of the

> Confederacy made an earnest appeal for an appropriation of $1000 for the Confederate monument, at the same time requesting that the monument association be given the front plat or portion of court house square as a site for the monument.
>
> Moved by J.S. Young that the $1000.00 be allowed and the front plat of court house square **be reserved for that purpose**, which motion was unanimously adopted.

[Doc. No. 10, Attachment #5[2] (emphasis added)].

The UDC commissioned Frank Teich to sculpt the Confederate Monument, which is made of marble and granite and is 30 feet tall. It sits on a round circle of land and is enclosed with a decorative fence.[3] It was unveiled on or about May 1, 1906, and has never been moved from its current location.

In 2002, United Title of Louisiana, Inc. ("United Title") conducted a title examination of the records of Caddo Parish with reference to Block 23 in the City of Shreveport. United Title did not find a deed to Caddo Parish, but found a reference to the "Court House" for that block recorded in a Plat Book in 1857. United Title further found that acquisitive prescription would long since have resolved any flaw in the dedication of the block to Caddo Parish. However, United Title found no conveyance of any portion of that block to UDC,[4] and no written conveyance has been produced.

In 2014, the Confederate Monument was listed with the National Register of Historic Places.

On September 22, 2016, the Commission passed Resolution No. 72 of 2016, which

---

[2] This document is marked "Exhibit 3," but is listed as attachment #5 to the memorandum in support of UDC's motion for a preliminary injunction in the CM/ECF system. To avoid confusion, the Court uses the attachment numbers.

[3] The Confederate Monument has been enclosed with a fence since before it was unveiled, although the type of fence has changed.

[4] The Court will make its own conclusions of law, but reports the findings of United Title as facts.

3

established a Citizen Advisory Subcommittee of its Long-Range Planning Committee. The Subcommittee was charged with reviewing the issue of whether the Caddo Parish Courthouse grounds were an appropriate location for the Confederate Monument. After holding several community meetings, on August 17, 2017, the Subcommittee recommended to the Commission that the Confederate Monument be maintained, but that two additional monuments be erected.

On October 19, 2017, the Commission passed Resolution No. 69 of 2017, which provides as follows:

> WHEREAS, the Confederate Monument currently on the lawn of the Caddo Parish Courthouse serves as an object of division and a painful reminder of racial inequities locally and nationally;
>
> WHEREAS, although historically significant, citizens would be better served if the monument was placed in a museum or at another site dedicated to memorials, instead of the Courthouse where justice is to be administered fairly and impartially;
>
> WHEREAS, the Caddo Parish Commission wishes to end the constant debate on the placement of this monument.
>
> NOW, THEREFORE, BE IT RESOLVED by the Caddo Parish Commission in due, regular and legal session convened, authorizes the Parish Administrator, assisted by the Parish Legal Staff, to pursue any and all legal means to remove the monument from the Caddo Parish Courthouse Square.
>
> BE IT FURTHER RESOLVED that if any provision or item of this resolution or the application thereof is held invalid, such invalidity shall not affect other provisions, items or applications which can be given effect without the invalid provisions, items or applications, and to this end, the provisions of this resolution are hereby declared severable.
>
> BE IT FURTHER RESOLVED that this resolution shall take effect immediately.
>
> BE IT FURTHER RESOLVED that all resolutions or parts thereof in conflict herewith are hereby repealed.

[Doc. No. 10, Attachment #1].

## II. CONCLUSIONS OF LAW

The Court makes the following conclusions of law:

In determining whether to grant or deny a preliminary injunction, the Court applies a four-part test:

(1) a substantial likelihood that plaintiff will prevail on the merits;

(2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted;

(3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to the defendant; and

(4) that granting the preliminary injunction will not disserve the public interest.

*Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974). "A preliminary injunction is an extraordinary remedy and should be granted only if the movant has clearly carried the burden of persuasion with respect to all four factors." *Allied Marketing Group, Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 809 (5th Cir. 1989) (citing *Mississippi Power & Light v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985); *Apple Barrel Productions, Inc. v. Beard*, 730 F.2d 384, 389 (5th Cir. 1984)). Failure of the movant to establish any one of the four factors defeats the right to injunction. *See Rohoe, Inc. v. Marque*, 902 F.2d 356 (5th Cir. 1990). "[E]ven if the varying strengths and weaknesses of each of the four preliminary injunction factors may cross-compensate, this relationship has limits; the movant still must always 'present a prima facie case.'" *Monumental Task Comm., Inc. v. Chao*, 678 F. App'x 250, 252 n.1 (5th Cir. 2017) (quoting *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013)). "Such a showing is required, because 'it is inequitable to temporarily enjoin a party from undertaking activity which [that party] has a clear right to pursue.'" *Id.* (quoting *Texas v. Seatrain Int'l, S. A.*, 518

F.2d 175, 180 (5th Cir. 1975)). "We find that concern particularly heightened when a federal court is asked to interfere with a state political subdivision's activity." *Id.*

    **A.    Likelihood of Success on the Merits Based on UDC's Alleged Ownership of the Plot of Land Where the Confederate Monument Sits**

To obtain a preliminary injunction, UDC must show, first, that it has a substantial likelihood of success on the merits of its claims under the First, Fifth, and Fourteenth Amendments.[5] UDC asserts these claims on the bases that it was not permitted to appeal the Commission's decision in violation of the Equal Protection and Due Process Clauses, that the Commission seeks to take its private property without due compensation, and that Resolution No. 69 seeks to regulate speech in UDC's private forum. To assert these constitutional claims, UDC relies on its alleged interest in the land upon which the Confederate Statute sits.[6] Therefore, if UDC does not have a substantial likelihood of proving that it owns the land, it cannot proceed with its constitutional claims.[7] The Court finds that UDC has not met this burden.

In support of its contentions, UDC argues that the minutes of the June 18, 1903 Caddo Parish

---

[5]*See Texas v. Seatrain Int'l, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975) ("No matter how severe and irreparable an injury one seeking a preliminary injunction may suffer in its absence, the injunction should never issue if there is no chance that the movant will eventually prevail on the merits.").

[6]*See* [Doc. No. 25, p. 4 ("UDC is seeking injunctive relief to order a halt to the removal of the Confederate Monument from its[] private property . . . .").

[7]Counsel dedicated the vast majority of their closing arguments to whether UDC does or does not own the plot of land where the Confederate Monument sits. UDC contends that its Due Process and Equal Protection rights were violated because it had no way to appeal the Commission's decision affecting its private land, its Fifth Amendment rights are being violated because the Commission is seeking to remove UDC's Confederate Monument from UDC's private land, and its First Amendment rights are being violated because the Commission is regulating its speech on its private land.

Policy Jury meeting are sufficient to constitute an oral donation of the plot of land. The Commission responds that such a donation had to be made by authentic act, not orally, and that UDC could not acquire title to this public land by acquisitive prescription. However, in its reply memorandum, UDC argues that an authentic act was not required because the Caddo Parish Police Jury's action constituted an onerous donation. UDC also contends that, under the doctrine of laches, the Commission should be barred from asserting ownership.

"The burden of proving that a donation has been made is initially on the donee." *Succession of Jackson*, 537 So. 2d 736, 739 (La. App. 2d Cir. 1988), writ denied, 541 So. 2d 857 (La. 1989) (citing *Pardue v. Turnage*, 383 So. 2d 804 (La. App. 1st Cir. 1980)). Three types of donations inter vivos are recognized under the Louisiana Civil Code: gratuitous, onerous, and remunerative. LA. CIV. CODE ARTS. 1468, 1526, and 1527. "The gratuitous donation is made purely from liberality; the onerous donation is burdened with charges upon the donee; and the remunerative donation is given to recompense the donee for services rendered in the past." *In re Succession of Van Brown*, 2013-1206 (La. App. 3 Cir. 3/5/14), 134 So. 3d 186, 187 (quoting 10 KATHRYN VENTURATOS LORIO, LOUISIANA CIVIL LAW TREATISE § 8:13. (2d ed. 2013)). UDC does not contend that the alleged donation was remunerative, but the Court has considered the other two possibilities.

Generally, "[a] donation inter vivos is a contract by which a person, called the donor, gratuitously divests himself, at present and irrevocably, of the thing given in favor of another, called the donee, who accepts it." LA. CIV. CODE ANN. ART. 1468. The law regarding the form of gratuitous inter vivos donations remains unchanged from 1870 to the present. Such donations must be made "by authentic act under the penalty of absolute nullity, unless otherwise expressly permitted by law." *Cf.* LA. CIV. CODE ART. 1536 (1870); LA. CIV. CODE ART. 1541 (WEST. 2009); *see also* LA.

7

CIV. CODE ART. 1541 Revision Cmts. 2008 ("(a) This Article reproduces the substance of former Civil Code Article 1536 (1870). It is not intended to change the law."). To support its burden of proof in this case, UDC relies on the minutes, which state that the front plot of Court House Square was "reserved" for the purpose of installing the Confederate Monument. However, it is undisputed that there is no authentic act accomplishing the alleged donation, as required by Louisiana law. Therefore, UDC has no substantial likelihood of success showing that it obtained an ownership interest in the plot based on the Caddo Parish Police Jury's gratuitous donation.

UDC argues, next, that the Caddo Parish Police Jury made an onerous donation of the plot, and, therefore, article 1541 (formerly article 1536) does not apply. Under the law applicable in 1870, the rules on donations inter vivos, including the requirement of an authentic act, did not apply to onerous donations unless "the value of the object given exceeds by one-half that of the charges or of the service" to be performed. LA. CIV. CODE ART. 1526 (1870).[8] "The rules applicable to donations inter vivos do not apply because it is not a true donation." *In re Brown*, 134 So. 3d at 188 (citing *Averette v. Jordan*, No. 16076 (La.App. 2 Cir. 1984), 457 So. 2d 691); see also *Hearsey v. Craig*, 126 La. 824 (1910) 53 So. 17, 20 (quoting then-applicable La. Civ. Code art. 1524 for the same proposition).

Even if the Court were to assume that UDC can otherwise meet the requirements of proving

---

[8]*See Succession of Dopler*, 40 La. Ann. 848 (1888), 6 So. 106 ("[A]rticle 1526, Civil Code, declares that 'the rules peculiar to donations inter vivos do not apply to onerous and remunerative donations, except when the value of the object given exceeds by one-half that of the charges or of the services.' Therefore the prohibitions of articles 1497, 1533, Civil Code, heretofore referred to, which apply exclusively to donations, have no application.") (citing *Landry v. Landry*, 40 La. Ann. 232 (1888), 3 South Rep. 728); *cf.* LA. CIV. CODE ARTS. 1526 and 1527 (the law now provides that the inter vivos general rules do not apply "unless at the time of the donation the cost of performing the obligation is **less than two-thirds** of the value of the thing donated.") (emphasis added).

8

an onerous donation, so that UDC is excepted from producing an authentic act, it must produce sufficient evidence to show a substantial likelihood of success that there was a donation at all. While it is clear that UDC **asked** for a donation of the plot of land and $1,000.00, the Caddo Parish Police Jury's vote gave UDC $1,000.00 and **"reserved"** the plot for the "purpose" of installing the Confederate Monument. The only evidence before the Court of the Caddo Parish Police Jury's intent in 1903 is the language contained in the minutes. The Court finds that the word "reserved" does not indicate an intent to donate the plot to UDC, and, therefore, UDC does not have a substantial likelihood of success on proving that there was a donation.

The Court first turned to Black's Law Dictionary to examine the meaning of the word "reserved." Although the specific word is not defined therein,[9] the word "reservation" is defined as

> 1. A keeping back or withholding. 2. That which is kept back or withheld. 3. The creation of a new right or interest (such as an easement), by and for the grantor, in real property being granted to another. 4. The right or interest so created in a grant. 5. The deed clause in which such a right or interest is created. — Also termed reserver. 6. The establishment of a limiting condition or qualification; esp., a country's formal declaration, upon signing or ratifying a treaty, that its willingness to become a party to the treaty is conditioned on the modification or amendment of one or more provisions of the treaty as applied in its relations with other parties to the treaty. 7. An express notice that certain rights are not abandoned or waived, as in a copyrighted work. 8. The setting apart of a designated part of a territory or tract of land for public uses or special appropriation. 9. A part of a territory or tract of public land that is not open to settlers but is set apart for a special purpose; esp., a tract of land set aside for use by indigenous peoples. — Also termed (in sense 3) reserve; reserved land; withdrawn land.

RESERVATION, BLACK'S LAW DICTIONARY (10th ed. 2014). None of these definitions support

---

[9] Although the term "reserve" is defined as a noun, that definition applies to funds of money, rather than a reservation of land. Reserve is defined as "1. Something retained or stored for future use; esp., a fund of money set aside by a bank or insurance company to cover future liabilities. 2. RESERVATION (3) 3. See *net value* under VALUE (2)." RESERVE, BLACK'S LAW DICTIONARY (10th ed. 2014). Thus, the Court relies on the definition of reservation, which has applicability in this case.

9

UDC's argument that the Caddo Parish Police Jury donated the plot of land to it by use of the word "reserved." Further, the general definition of "reserved" is consistent with that meaning. "Reserved" is defined as "kept or set apart or aside for future or special use." *Merriam-Webster,* https://www.merriam-webster.com/dictionary/reserved, last visited 01/22/2018. While words may change in meaning over time, there is no evidence or authority that such is the case with this particular word. *See* https://www.etymonline.com/word/reserve (last visited 01/22/18) ("mid-14c., from Old French reserver 'set aside, withhold' (12c.) and directly from Latin reservare 'keep back, save up; retain, preserve,' from re- 'back' (see re-) + servare 'to keep, save, preserve, protect' (from PIE root *ser- (1) 'to protect'). Meaning 'to book' is from 1935. Related: Reserved; reserving.").

Indeed, consistent with the definitions found, in the common parlance, the reservation of anything only gives the person to whom the thing is reserved use, not ownership. For example, seating is often reserved at public venues, but no person would interpret his right to sit in a certain area as an ownership of the seat or that the seat had been donated to him. Thus, the Court finds that UDC does not have a substantial likelihood of success on the merits of an argument that the term "reserved" in 1903 minutes constitutes an oral onerous donation.[10]

---

[10]UDC has also offered certain evidence through the testimony of its expert, Dr. Joiner, and based on statements on the Commission's website. While the Court appreciates UDC's thoroughness, neither resolves the question before the Court. The fact that there is a statement on the Commission's website that the "land on which this monument sits . . . does not belong to the Commission but to the [UDC]" [Doc. No. 25, Attachment #2], if relevant, is certainly not dispositive. Dr. Woodrow Wilson, Jr., the Caddo Parish administrator, testified that it is unclear when the statement was prepared, by whom, and whether it was approved by anyone in management. He described the statement as being "in the realm of human error." The current website manager, Nathan Schlichtemier, testified that his research found that the page was published in 2012 by the former web site manager, but that still does not answer the question of where the information came from, or if it was approved. It is debatable whether the statement is even admissible as an admission by the party opponent, rather than inadmissible hearsay. *See* FED R. EVID. 801(d)(2). Regardless, the belief or opinion of a current or former Commission

10

Additionally, even if the "reserved" language was sufficient to constitute an oral donation, UDC has failed to show that it is not required to prove this donation by authentic act. An alleged onerous donation is only exempt from the requirement of an authentic act if UDC, as the alleged donee, can produce sufficient proof that the value of the object given–the plot–does not exceed by one-half the service to be performed–the purchase and installation of the Confederate Monument. At the hearing, UDC's expert, Dr. Gary Joiner, testified that Larkin Edwards, a Caddo Indian Agent, sold his "one square mile reserve" for $5,000 to Caddo Parish, but reserved Block 23, which is Court House Square. However, Dr. Joiner also testified that Mr. Edwards' descendants have never challenged the ownership of Court House Square or the plot at issue. Caddo Parish has used Block 23 as public property continually since the 1840's, but there was no evidence presented at the hearing as to the value of the plot at the time of the alleged donation, nor of the value of the Confederate Monument at that time, other than the $1,000 donation by the Caddo Parish Police Jury towards its purchase. As part of the exhibits attached to its supporting memorandum, UDC included its application to the National Register of Historic Places, in which it quotes historian Eric Brock's article in a magazine that the Confederate Monument cost $10,000.00. However, this hearsay within hearsay is not admissible to prove the cost of the Confederate Monument, and no evidence was

---

employee has no impact on the Court's duty to determine the issue of law–whether UDC has produced sufficient evidence to show a substantial likelihood of success on proving its ownership interest in the plot where the Confederate Monument sits, based on the actions of the Caddo Parish Police Jury in 1903.

Likewise, the Court appreciates, respects, and has considered the testimony of Dr. Joiner. He offered his "thoughts" that the Caddo Parish Police Jury intended to "reserve [the plot] in perpetuity forever." However, he admitted that these were only his thoughts, not evidence from the record. While his thoughts are certainly based on his expertise and experience, they simply are not dispositive. Further, the Caddo Parish Police Jury minutes do not reflect a reservation "in perpetuity," but use only the word "reserved."

11

produced to prove the relative value of the plot of land in 1903. While it is reasonable to assume that the plot of land was valued less than the Confederate Monument, the Court is not allowed to assume. The UDC failed to present sufficient evidence showing that the alleged donation was "onerous," rather than "gratuitous," when there is no admissible evidence of the relative value of the plot of land versus the cost of commissioning, obtaining, and erecting the Confederate Monument.[11] UDC has also argued that the Caddo Parish Police Jury's donation was "ratified" in 1962 under LA. REV. STAT. 41: § 13235. That statute provided that "transfers . . . of public property by . . . police juries made prior to twelve o'clock, noon, July 28, 1948 are hereby validated, ratified and confirmed unto the original . . . transferees . . . notwithstanding any informalities provided there was valid consideration therefor." *Id.* However, this argument assumes that a "transfer" was made by the police jury and, further, that there was consideration for the transfer. UDC has not shown that it has a substantial likelihood of success on the merits of proving either.

The Court has considered whether UDC obtained title to the front plot by acquisitive prescription, but this legal theory also fails. Private citizens cannot acquire title to property from the government by acquisitive prescription. *See* R. J. SCALISE, JR., 2 LA. CIV. L. TREATISE, PROPERTY § 3:10 (5th ed. 2017) ("Public things of the state and its political subdivisions are imprescriptible. . . and a private person may not acquire by acquisitive prescription the ownership of any thing that the state owns. . . There is no constitutional provision declaring that public things belonging to a political subdivision of the state are imprescriptible. The imprescriptibility of such things is a consequence of their insusceptibility of private ownership under Article 450 of the Civil Code.").

---

[11]Although it is theoretically possible for UDC to produce additional evidence, UDC's counsel stated at the hearing that UDC has produced all available evidence.

Likewise, "municipal property which is dedicated to a public use is not alienable, not subject to private ownership, and therefore cannot be acquired by prescription." *City of New Orleans v. Salmen Brick & Lumber Co.*, 135 La. 828, 66 So. 237 (1914); *see also City of New Orleans v. Carrollton Land Co.*, 60 So. 695, 696 (La. 1913) ("Such property is out of commerce; and it is dedicated to public use, and held as a public trust, for public uses. It is inalienable by corporations."); *Shreveport v. Frank C. Walpole*, 22 La. Ann. 526, 529 (1870) ("The dedicated property, being held as a public trust, and for public uses, is inalienable by the corporation. It is of that class of property defined in the first clause of article 449 of the Civil Code as 'common property, to the use of which all the inhabitants of a city or other place, and even strangers, are entitled in common, such as the streets, the public walks, the quays.'").

Finally, UDC argues that the common law doctrine of laches should be applied in this case. Laches is an affirmative defense recognized in federal law, as well as in common law. However, the underlying issue in this case is of Louisiana law–the ownership of the plot where the Confederate Monument sits. UDC has cited the Court to no authority which would support the idea that a Louisiana court applying Louisiana law would allow it to use laches affirmatively to prove ownership of an immovable. *See generally* John T. Cross, *The Erie Doctrine in Equity*, 60 LA. L. REV. 173, 232 n. 264 (1999) ("A federal court adjudicating a state-law claim must make an initial reference to state law to determine if laches and unclean hands are 'complete' **defenses** that may be used against both legal and equitable claims. If the state law treats it as a complete bar, and the federal standard for laches or unclean hands is the same as the state, a federal court that ignored the **defense** would in effect be creating a substantive right.") (emphasis added). Allowing UDC to affirmatively apply a common law defense in this case would be inconsistent with the law on

acquisitive prescription discussed, *supra*. In other words, allowing UDC to affirmatively use the defense of laches against the Commission would, in effect, result in a finding that UDC had obtained title or ownership to the plot where the Confederate Monument sits by acquisitive prescription.

As UDC has failed to demonstrate a substantial likelihood of success on the merits of its contention that it owns the plot of land where the Confederate Monument sits, it has no substantial likelihood of success on the constitutional claims its asserts based on this alleged property interest. *See Board of Regents v. Roth*, 408 U.S. 564, 577 (1972) (noting that a claimant asserting a property interest requiring Due Process under the Fourteenth Amendment must show more than a "unilateral expectation of it[ ]" and must "have a legitimate claim of entitlement to it."); *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194-95 (1996) ("The Fifth Amendment does not proscribe the taking of [private] property; it proscribes taking without just compensation . . . the **property owner** cannot claim a violation of the Just Compensation Clause until it has used [a state procedure for seeking just compensation] and been denied just compensation)(citing *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 297, n. 40 (1981); *see generally Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467–68 (2009) (In its own forum, "[a] government entity has the right to speak for itself . ... . [I]t is entitled to say what it wishes, and to select the views that it wants to express.")[12] (citations and internal quotation marks omitted); *see also Monumental Task Comm., Inc v. Foxx*, 157 F. Supp. 3d 573, 594 (E.D. La. 2016), *aff'd sub nom. Monumental Task Comm.*, 678 Fed. App'x 250 ("To state a cause of action under § 1983 for violation of the Due Process Clause, plaintiffs 'must show that they have

---

[12]UDC argued that the Commission sought to regulate its speech in its private forum; however, it has failed to provide sufficient evidence that there is a substantial likelihood of success in proving that the forum is private, rather than the property of Caddo Parish.

asserted a recognized 'liberty or property' interest[13] within the purview of the Fourteenth Amendment, and that they were intentionally or recklessly deprived of that interest, even temporarily, under color of state law.' . . . If there is no denial of life, liberty, or property, then the government is not required to provide due process.") (quoting *Doe v. Taylor Indep. Sch. Dist.*, 15 F. 3d 443, 450 (5th Cir. 1994)) (other citations omitted).

### B. Arguments Based on UDC's Alleged Ownership of the Confederate Monument

To fully address arguments raised by the UDC, the Court has also considered the impact of UDC's alleged ownership of the Confederate Monument. Although UDC's arguments in its briefs and at the hearing were based on its ownership of the plot of land where the Confederate Monument sits,[14] UDC seems to make, at least in passing, two arguments which could be based on its alleged ownership of the Confederate Monument itself: (1) the removal of the Confederate Monument will violate federal regulations applicable to properties listed in the National Register of Historic Places, and (2) the Commission is "forcing" UDC to pay for the removal of the Confederate Monument. The Court first notes that the Commission has argued that, because the Confederate Monument was erected on public property, "the parish owns the monument and has authority to dispose of it in any manner it pleases." [Doc. No. 12, p. 5 (citing *Sarpy v. Municipality No. 2*, 9 La. Ann. 597, 599 (La. 1854); LA. CIV. CODE ART. 454 (1870))[15]]. While the Commission's argument finds some support

---

[13]UDC does not assert that any liberty interest has been violated.

[14]*See* [Doc. No. 10, p. 4 ("UDC seeks a Temporary Restraining Order and/or Preliminary Injunction requiring [the Commission] not to remove the Confederate Monument from the Plaintiff's **private property** in violation of Plaintiff's First, Fifth, and Fourteenth Amendment Rights.") (emphasis added)].

[15]Article 454 provided in 1870 that "Things which are for the common use of a city or other place, as streets and public squares, are likewise public things."

under Louisiana law, even if the Court found that the Confederate Monument is UDC's private property, UDC has failed to establish a substantial likelihood of success on the merits of these claims, too.[16]

First, UDC failed to cite the Court to any authority to support the proposition that UDC has a private cause of action under the National Historic Preservation Act ("NHPA"), 54 U.S.C. § 300101, *et seq.*, and its implementing regulations against the Commission, a political subdivision of the State, for the removal of the Confederate Monument. *See San Carlos Apache Tribe v. United States*, 417 F.3d 1091 (9th Cir. 2005) (no private right of action under the NHPA); *see also Karst Envtl. Educ. & Prot., Inc. v. E.P.A.*, 475 F.3d 1291, 1295 (D.C. Cir. 2007) (same); *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1173 (11th Cir. 2006) (same). Prior to the Supreme Court's decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001),[17] some courts, including the United States Court of Appeals for the Fifth Circuit, recognized a cause of action against federal defendants under the NHPA directly. *See Bywater Neighborhood Association v. Tricarico*, 879 F.2d 165, 167 (5th

---

[16]Even if UDC owns the Confederate Monument, the case law does not support the issuance of a preliminary injunction to prevent its removal from public property. *See State ex rel. Singelmann v. Morrison,* No. 19791 (La. App. 4th Cir. 3/3/52), 57 So. 2d 238, 244-46 (finding that neither an "individual [n]or [a] private association has the right to erect a memorial on public property without the consent of the governing authorities"; the location, manner, and design of statues is within the discretion of the governing authorities; and the governing authorities can require removal of monuments located on public property); *see also Monumental Task Comm., Inc. v. Foxx*, 259 F. Supp. 3d 494, 507–08 (E.D. La. 2017) (citing same). Nevertheless, the Court has considered whether UDC might have some likelihood of success on the merits of claims based on its ownership and thus whether these claims could support the issuance of any injunction.

[17]Under *Alexander v. Sandoval*, 532 U.S. 275 (2001), "a plaintiff suing under an implied right of action still must show that the statute manifests an intent 'to create not just a private right but also a private remedy.'" *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002) (quoting *Alexander*, 532 U.S. at 286).

Cir.1989); *Vieux Carre Prop. Owners v. Brown*, 875 F.2d 453, 457–58 (5th Cir.1989) ; *see also Ringsred v. City of Duluth*, 828 F.2d 1305, 1309 (8th Cir. 1987). However, those decisions do not appear viable since the *Alexander* decision.[18]

In a recent case in the Eastern District of Louisiana, the plaintiffs did not attempt to bring their claims directly under the NHPA, but argued, consistent with *Alexander*, that federal defendants were liable for alleged violations of the NHPA under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706. *Monumental Task Committee*, 157 F. Supp. 3d at 585-86;[19] *see also San Carlos Apache Tribe*, 417 F.3d at 1099 (although there is no private right of action, a party can pursue a remedy against federal defendants under the APA).

Regardless, if there is a private right of action under the NHPA or whether UDC could only

---

[18]In a 2011 decision, the Fifth Circuit stated:

Both parties and the district court assume, under this court's decision in *Bywater Neighborhood Association v. Tricarico*, 879 F.2d 165, 167 (5th Cir.1989), that the NHPA gives Friends of St. Frances Xavier Cabrini a private right of action to enforce the NHPA itself outside the APA review process. *See also Vieux Carre Prop. Owners v. Brown*, 875 F.2d 453, 457–58 (5th Cir.1989) (same). Although we are bound by the *Bywater* and *Vieux Carre* courts, we note that the Supreme Court's recent jurisprudence casts serious doubt on the continued viability of the private right of action under the NHPA. *See San Carlos Apache Tribe v. United States*, 417 F.3d 1091 (9th Cir.2005) (relying on *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) to find that there is no private right of action under the NHPA); *see also Karst Envtl. Educ. and Prot., Inc. v. EPA*, 475 F.3d 1291, (D.C.Cir.2007) (same).

*Friends of St. Frances Xavier Cabrini Church v. Fed. Emergency Mgmt. Agency*, 658 F.3d 460 (5th Cir. 2011).

[19]The Eastern District found no likelihood of success on the merits of this claim because the plaintiffs failed to demonstrate "any nexus between a federally-funded project or undertaking and the removal of the monuments at issue[,]" a decision which was affirmed by the United States Court of Appeals for the Fifth Circuit. *Monumental Task Comm.*, 157 F. Supp.3d at 591, *aff'd sub nom. Monumental Task Comm., Inc. v. Chao*, 678 Fed. App'x 250 (5th Cir. 2017)

pursue review under the APA, both these types of actions assume the presence of a federal defendant. There is no authority to support any cause of action against the Commission, which is not a federal entity and is not acting pursuant to federal authority or by use of federal funding. *See Vieux Carre*, 875 F.2d at 458 (no cause of action against a non-federal-agency defendant); *W. Mohegan Tribe & Nation of N.Y. v. New York*, 246 F.3d 230, 232 (2d Cir.2001) (affirming dismissal of NHPA claim brought against the State of New York). In the absence of statutory authority or precedential case law, the Court finds that UDC has no substantial likelihood of success on the merits on a claim under the NHPA against the Commission (or under the APA).

Second, UDC also appears to argue in its reply memorandum that, because Resolution No. 69 "provide[s] no taxpayer funding for the removal of the Confederate Monument," UDC will be forced to pay more than $577,000.00 for the removal of the Confederate Monument, a violation of the Takings Clause. Both the evidence presented by the Commission and the UDC show that removal of the Confederate Monument will be costly, although their estimates differ.[20] Nor does the Commission dispute that a marble and granite statute is fragile, as argued by UDC. However, UDC did not present evidence that the Commission can, or will, force it to bear the burden and costs of removal. Thus, UDC has failed to establish a substantial likelihood of success on the merits of a Takings Claim based on its alleged duty to remove the Confederate Monument.

Therefore, the Court finds that UDC has failed to prove a substantial likelihood of success on the merits of claims based on its ownership of the Confederate Monument.

---

[20]The Commission obtained estimates for removal and storage and for removal and reassembly of the Confederate Monument at costs of $278,650.00 and $298,400.00, respectively. [Doc. No. 12, Attachment #7].

### C. Other Factors

Having determined that UDC failed to establish a substantial likelihood of success on the merits, the Court need not reach the remaining factors. *See La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 608 F.3d 217, 225 (5th Cir. 2010) ("Because we have determined that Plaintiffs cannot show a substantial likelihood of success on the merits, we need not address . . . the other necessary elements for preliminary injunctive relief.").

### III. CONCLUSION

As with any motion seeking injunctive relief, UDC, as the plaintiff, bears the burden of establishing a substantial likelihood of success on the merits. To meet this burden, UDC has relied primarily on its status as the alleged owner of the plot of land where the Confederate Monument sits. In so relying, UDC faces the uphill battle of trying to prove that the words of 1903 minutes are sufficient to establish its ownership of that plot as a matter of law. Based on the evidence presented, the Court concludes that UDC has failed to meet that burden, or to show that it is entitled to relief otherwise. Therefore, for the foregoing reasons, UDC's motion for a preliminary injunction, contained in its Complaint [Doc. No. 1], is DENIED. Its motion for a temporary restraining order [Doc. No. 10] is DENIED AS MOOT.

MONROE, LOUISIANA, this 26th day of January, 2018.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

| | |
|---|---|
| SHREVEPORT CHAPTER #237 OF UNITED DAUGHTERS OF THE CONFEDERACY | CIVIL ACTION NO. 17-01346 |
| VERSUS | JUDGE ROBERT G. JAMES |
| CADDO PARISH COMMISSION, ET AL. | MAG. JUDGE MARK L. HORNSBY |

# ORDER

For the reasons set forth in this Court's Ruling,

IT IS ORDERED that Plaintiff's motion for preliminary injunction [Doc. No. 1], contained in its Complaint, is DENIED.

IT IS FURTHER ORDERED that Plaintiff's motion for a temporary restraining order [Doc. No. 10] is DENIED AS MOOT.

MONROE, LOUISIANA, this 26th day of January, 2018.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE