# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# SHREVEPORT DIVISION

SHREVEPORT CHAPTER #237 OF THE UNITED          CASE NUMBER: 17-CV-01346
DAUGHTERS OF THE CONFEDERACY

                                        **Plaintiff,**          **JUDGE: ROBERT G. JAMES**

**VERSUS**

THE CADDO PARISH COMMISSION, ET AL.          **MAGISTRATE JUDGE: MARK L.
                                             HORNSBY**

                                    **Defendants.**

## MEMORANDUM IN OPPOSITION OF MOTION FOR SUMMARY JUDGMENT FILED BY THE DEFENDANT THE CADDO PARISH COMMISSION

**MAY IT PLEASE THE COURT:**

### INTRODUCTION AND SUMMARY OF THE PROCEDURAL BACKGROUND

Plaintiff The Shreveport Chapter #237 of the United Daughters of the Confederacy ("UDC") filed this case because of the viewpoint discrimination against the Plaintiff by the Defendants Caddo Parish Commission ("Commission") and its' seven (7) individual members who voted for Resolution No. 69 of 2017 ("Resolution No. 69") on about October 19, 2017.  The Plaintiff UDC did not make the five members of the Defendant Commission who did not vote in favor of Resolution No. 69 parties to this lawsuit.  (See, Exhibit 1: The full text of Resolution No. 69 is on the final page of Exhibit  1). Prior to the passage of Resolution No. 69 on September 18, 2017, Caddo Parish Commission's Long Range Planning/Special Projects Committee (a subcommittee of the Caddo Parish Commission) rejected the recommendation of the Monument Advisory Committee (established in 2016) which recommended non-removal of the Confederate Monument.  Although chaired by an opponent of the Confederate Monument named Ralpheal Johnson, a majority of the Monument Advisory Committee recommended keeping the Confederate Monument in its' current place.  Plaintiff shows that Louisiana Office of

1

Alcohol and Tobacco Control arrested Ralpheal Johnson for extortion and public bribery charges in 2011.  See, Exhibit 1-1.

The Plaintiff further filed its' lawsuit because Resolution No. 69 "recommends" the removal of the Confederate Monument from its' <u>private property</u> (which has been enclosed in 1906) which is located within the Caddo Parish Courthouse Square. See, Exhibit 1-2 (Picture of the Confederate Monument Taken on May 1,1906).  Although Plaintiff acquired ownership of the land underneath the Confederate Monument via acquisitive prescription, Plaintiff has a quitclaim deed which confers any ownership interest of some of the heirs of Larkin Edwards to it. See, Exhibit 2.  As for the Defendant there is ample evidence of a dedication of Shreveport Block 23 for the construction of the Caddo Parish Courthouse and permission for "public use" from the owners of Shreveport Block 23 in the 1840s.  In addition Caddo Parish does not possess any written instrument which purports to give the said parish ownership of it and Caddo Parish could not acquire the ownership of Shreveport Block 23 via either the ten (10) or thirty (30) years prescription.  However, the use of property for public purposes does not make the property public; and "If the property was dedicated to public use, it reverted to the original owner free from such use by the abandonment of the use."  See, *Angus McNeil et al., v. Hicks & Howell*, 34 La. Ann. 1090 (La. 1882).  Thus, Defendant  has never acquired the ownership of Shreveport Block 23.

In the instant matter Plaintiff's Caddo Parish Confederate Monument ("Confederate Monument") is a visible symbol which is highly controversial and sparked strong protests and demands from the Defendant.  The Defendant's decision to order the removal of the Confederate Monument in order to satisfy the opposing views of the Defendant's is not legitimately related to any government interest much less narrowly tailored to meet it.  And as a result of  Defendant's violation of the Plaintiff's First, Fifth, and Fourteenth Amendment Rights, Plaintiff filed suit under 42 U.S.C. § 1983.

2

On December 11, 2017, this Honorable Court held a hearing on the Plaintiff's Motion for Preliminary Injunction.  After taking it under advisement, this Honorable Court denied the Plaintiff's Motion for Preliminary Injunction on January 26, 2018.  On February 6, 2018, the Plaintiff filed a Motion to Reconsideration of this Honorable Court's Denial of Preliminary Injunction and this Honorable Court denied the said motion on May 14, 2018.

## SUMMARY OF THE BACKGROUND FACTS CONCERNING PLAINTIFF AND THE CONFEDERATE MONUMENT

Originally an unincorporated association formed in 1896, the Plaintiff became a chapter of the Louisiana Division of the United Daughters of the Confederacy, and named Shreveport Chapter #237 (the 237th chapter formed in the United States).  In 1903, the Plaintiff asked the Defendant Commission's predecessor the Caddo Parish Police Jury for aid for the construction of the Confederate Monument.  In response the Caddo Parish Police Jury donated $1,000.00 for the construction of the Confederate Monument and gave a plot of land "in perpetuity" to it.  See, Exhibit 3 (Police Jury: Official Proceedings of the Session Held on June 18, 1903 which states in part, "...that monument association be given the front portion of the court house square as a site for the monument...and the front plat of the court house square be reserved for the purpose, which motion was unanimously adopted."); Exhibit 4, and Exhibit 5 page 9 (National Register of Historic Places Registration Form).  Plaintiff treated the Caddo Parish Police Jury's actions as an oral donation for the site of the Confederate Monument (the minutes are not an actual written conveyance; but it is evidence that the Defendant had relinquished the dedication of said site for the public use for the Caddo Parish Courthouse for the Plaintiff's private use).  In 1905, Plaintiff enclosed the Confederate Monument with a fence.  The Plaintiff dedicated its' said monument in 1906. In 1958, the U.S. government recognized  Confederate veterans as United States war veterans.  See, 38 U.S.C. § 1501.  Thus, the Confederate Monument

3

became a monument to U.S. War veterans.  In 2014, the Confederate Monument entered the National Register of Historic Places.

The Confederate Monument is a 30 foot tall granite and marble cenotaph enclosed by a decorative fence initially in 1905.  Sculpted by  the renowned Frank Teich, he created a monument which also honors the role that women played in its' creation; for he sculpted a female figure as a prominent integral feature of it.  Last of the four major Confederate Monuments that venerate the soldiers or military leaders of the Confederacy, the Caddo Parish Confederate Monument honors the men and women who served the cause of the Confederacy; and in some respects a memorial for those without a proper burial or interred in unmarked graves of Confederate soldiers.  This monument was one of four major Confederate Monuments in Louisiana.

Despite two of them being on the National Register of Historic Places, the City of New Orleans removed the other three major Confederate Monuments.  As for the General Beauregard Equestrian statue ("PGT B. Equestrian statue"), a member of the Friends of City Park, the Beauregard Monument Association, and Beauregard camp No. 130 filed a lawsuit against the New Orleans City Park Improvement Association in order to have the said PGT B. Equestrian statue returned to its' former location. See, *Paulette Stewart, the Beauregard Monument Association, Inc. and Beauregard Camp No. 130, Inc. v. New Orleans City Park Improvement Association*, No. 2017-10833, Orleans Parish District Court, New Orleans, Orleans Parish, Louisiana; and Exhibit 5-1 (A Copy of the Lawsuit Filed in Orleans Parish On November 9, 2017).

Undisputedly  Plaintiff has possessed site of the Confederate Monument since 1903.  See, Exhibit 3, Exhibit 4, Exhibit 5, Exhibit 5-2, page 34 (Property Owner/SHPO or FPO Listed and Accepted As Such is the Plaintiff); and Exhibit 6 (A photocopy of the official Defendant Caddo Parish Commission webpage which states, "A very interesting fact about the land on which the monument site

is that it does not belong to the Commission but to the Daughters of the Confederacy.") From 1903 till the present, the Plaintiff has neither abandoned its' private property.  Thus, the evidence clearly shows that the Plaintiff acquired ownership of the land underneath the Confederate Monument via acquisitive prescription because Shreveport Block 23 was never public property. In addition on April, 2017, some of the heirs of Larkin Edwards signed a Quitclaim Deed conveying their ownership interest of the land underneath the Confederate Monument to Plaintiff.  Thus, Plaintiff still owns the site of the Confederate Monument on the exact spot where the last Confederate flag flew at a Confederate capital city.

Despite the claims that the Confederate Monument is a "symbol of racial injustice" Plaintiff further shows that Arlington National Cemetery ("Arlington")has a Confederate Memorial too.  See, Exhibit 7, pp. 20 thru 25.  This same Confederate Memorial depicts an African-American in Confederate uniform.  See, Exhibit 7 p. 3.  The very first U.S. war memorial to include African-Americans is this Confederate Memorial.  And Confederate General Robert E. Lee donated the land for Arlington National Cemetery after the Civil War.  Today the Caddo Parish Confederate Monument is extremely fragile and there has been some repairs made to it.  See, Exhibit 8-1 (Email from Charles A. Phillips to Jackie Nichols on August 3, 2016).  And any permanent damage that results from removal from public view will silence history and a view from the past.

## SUMMARY OF THE BACKGROUND HISTORY OF THE LAND UNDERNEATH THE CONFEDERATE MONUMENT

The contested land underneath the Confederate Monument originated from an aboriginal title held by the Caddo Indians.  Originally the United States acquired the lands that makeup Caddo Parish in a treaty signed with Caddo Indians in 1835.  See, Exhibit 2 (Full text of the Treaty with the Caddo, 1835).  And in this said treaty, the U.S. government recognized Larkin Edwards' floating reservation of 640 acres given to him by the Caddo Indians.  In October, 2017, some of the Caddo Parish

Commissioner claimed that a court case gave them ownership of Shreveport Block 23.  See, *Akins et al. v. Caddo Parish Police Jury*, 234 So. 2d 203 and Exhibit 9.  However, this case excludes the City of Shreveport as an owner of Shreveport Block 23; but its ruling did not confer ownership on the Caddo Parish Police Jury either.  And on May 31, 2018, Defendant claims that a document purporting to be a valid sale of Larkin Edwards' said floating reservation to the Shreve Town Company had removed any claims of ownership by Larkin Edwards to Shreveport Block 23.  See, Exhibit A of Exhibit 10, p 400 of. (Memorandum in Support of Summary Judgment).  However, a subsequent document nullified said sale from Larkin Edwards to the Shreve Town Company.  See, Exhibit A of Exhibit 10, p. 397.

The time-line of pertinent events in the history of Shreveport Block 23 is the following:

1). On July 1, 1835, the Caddo Indians signed a treaty with the United States.  This treaty recognized a grant by the Caddo Indians of a floating reservation of 640 acres to their interpreter Larkin Edwards.  This said floating reservation included what later became known as Shreveport Block 23.  See, Exhibit 2;

2). On January 26, 1836, the United States ratifies said treaty; and President Andrew Jackson proclaimed it on February 2, 1836.  The United States government recognizes such "fees simple title to all the rights which the Caddoes had in these lands."  See, *United States v. Brooks*, 51 U.S. 442 (1850); and Exhibits 11, 12 & 13.  (For details showing the current opinions concerning the ownership of Shreveport Block 23 see Exhibits 14 thru 18).

3). On February 3, 1836, Larkin Edwards allegedly sold his interest in his said floating reservation of 640 acres to Angus McNeil and seven others for five (5) thousand dollars. See, Exhibit A, p. 400 of Exhibit 10 (Memorandum in Support of Motion for Summary Judgment) On May 27, 1836, these eight (8) men formed the Shreve Town Company.  See, Exhibit A of Exhibit 10, p. 314 (Memorandum in Support of Motion for Summary Judgment); and *Pickett et al. v. Brown et al.*, 18 La. Ann. 560 (La. 1866); and Exhibit 19. On February 7, 1837, Angus McNeil and these seven (7) others incorporated the Shreve Town Company a/k/a the Shreveport Town Company ("Shreve Town Company") in order to sale and manage those original 64 lots. See, *City of Shreveport v. Walpole*, 22 La. Ann. 526 at 527 (La. 1870) and Exhibit 13.  Subsequent to this said alleged sale to the Shreve Town Company, it divided the 640 acres into lots and streets.  Present day downtown Shreveport is situated "upon and within that grant." See, *Angus McNeil et al., v. Hicks & Howell*, 34 La. Ann. 1090 (La. 1882) and Exhibit 12.  In this case the Louisiana Supreme Court ruled that "[t]he dedication of property to public use needs not be made in express terms. *Angus McNeil et al., v. Hicks & Howell*, 34 La. Ann. 1090; citing *Lomax v. Phillips*, 113 La. 858, 37 South 777, 68 L. R. A. 661. In *McNeil*, the plaintiff tried to claim ownership over property dedicated as "property for public

use." However, the district court ruled against the plaintiff because the property at issue "was not their property in the same sense as the lots which they partitioned [i.e. the said 640 acres]"...nor is there any evidence to raise a presumption that they ever intended to interpose any claim to it." See, *Angus McNeil et al., v. Hicks & Howell*, 34 La. Ann. 1090 at 1092 (La. 1882); and Exhibit 12;

4). In 1837, the Shreve Town Company "laid off the town of Shreveport, at Bennet & Cane's Bluff, on the south side of the Red River, upon the location made there of the grant to Larkin Edwards; that the town was incorporated by act of the [Louisiana] Legislature, passed in 1839." See, See, *City of Shreveport v. Walpole*, 22 La. Ann. 526 at 527-528 (La. 1870); and Exhibit 13. However, the Shreve Town Company did not lay claim to the "open space" land between Commerce Street and the Red River. The City of Shreveport had taken ownership of this "open space" as public property by an ordinance passed on November 14, 1848. For this reason the plaintiff (who never possessed a title to Shreveport Block 70 which is situated in this "open space") could not claim ownership of this public property. See, *City of Shreveport v. Walpole*, 22 La. Ann. 526 at 528 (La. 1870); and Exhibit 13;

5). On March 14, 1840 (filed on June 12, 1845), Larkin Edwards signed a document which declared that the sale of his floating reservation of 640 acres to Angus McNeil, Bushrod Jenkins, to the Commercial firm of Bennet & Cane composed of William Smith Bennet and James Huntington Cane, and to Captain Henry Shreve to be "null and void and as though the same had never been passed, and I [i.e. Larkin Edwards] do hereby further bind myself, my heirs, executors and administrators, to pass and sign an authentic Act of Sale of the above mentioned tract of land before any Notary or other public officer duly authorized to receive and record contracts in the said State whenever I or they do hereby required to do so." See, Exhibit A of Exhibit 10, p. 397 (Memorandum in Support of Motion for Summary Judgment). The Shreve Town Company was made up of Angus McNeil, Bushrod Jenkins, Captain Henry Shreve, Bennet & Cane , James B. Pickett, T.T. Williamson, Thomas Taylor Williamson, and S. Sprague;

6). There is no record that Larkin Edwards signed an authentic Act of Sale necessary for the sale of his floating reservation of 640 acres to anyone. Therefore, Larkin Edwards never relinquished the ownership of the unsold lots (including Shreveport Block 23). And no records exists showing that anyone had sold Shreveport Block 23 to the Caddo Parish Police Jury;

7). At age 51, Larkin Edwards died in 1841. Leaving a small succession of 242 acres of land, slaves and personal property, his six (6) heirs voluntarily partitioned his property prior to opening his succession; but later a district court declared those partitions null. See, *Wright and Williams v. Mrs. M.D.C. Cane, et al.*, 18 La. Ann. 579 (La. 1866) and Exhibit 20. There is no record that the six (6) heirs opened a succession for the estate of Larkin Edwards. Thus, possibly over one hundred of his heirs still have an ownership interest in Shreveport Block 23;

8). The Shreve Town Company remained in existence until December 14, 1841, whereby the decree of judicial partition was rendered and "the partition was effected on the 10[th] of May, 1843." See, *Pickett et al. v. Brown et al.*, 18 La. Ann. 560 (La. 1866) and Exhibit 19.

7

9).  On December 14, 1841 (but the partition of the properties was not effected until May 10, 1843), the Shreve Town Company dissolved and sold many lots within the incorporated limits (the remaining lots were divided among the former owners of the Shreve Town Company after May 10, 1843).  See, *Angus McNeil et al., v. Hicks & Howell*, 34 La. Ann. 1090 at 1092 (La. 1882), Exhibit 12; and *Pickett et al. v. Brown et al.*, 18 La. Ann. 560 (La. 1866), Exhibit 19; However after May 10, 1843, no sale of Shreveport Block 23 had taken place; and no former owners of the Shreve Town Company has ever claimed it.  Thus, based off the aboriginal title held by the Caddo Indians and conveyed to  Larkin Edwards by the treaty (in 1835) and the nullification of the sale of his floating reservation (in 1840), he (and now his estate) has ownership of Shreveport Block 23;

10).  Five years after the death of Larkin Edwards and on June 2, 1846, the Caddo Parish Police Jury minutes states, "From inquiry your Committee have been led to believe that the title vested in the Parish of Caddo to the lot of ground know as the public square [i.e. Shreveport Block 23] is of <u>too precarious and uncertain a character to justify the erection of any public building there.</u>" (underline added by undersigned counsel). See, Exhibit B of Exhibit 10, p. 72 (Memorandum in Support of Motion for Summary Judgment).  Since Larkin Edwards never signed an authentic Act of Sale for his said floating reservation by 1841, there is no evidence of a title which "vested in the Parish of Caddo"in 1846;

11).   On August 3, 1846, the Caddo Parish Police Jury minutes states, "The undersigned appointed a Committee to investigate the title vested in the Public Square [i.e. Shreveport Block 23] in the Town of Shreveport, in and to the Parish of Caddo, beg leave to report that their investigation has resulted in a full conviction that the Police Jury of said Parish has <u>full and complete right to use the Public Square for the erection thereon of the public buildings</u> as was originally designed by the Shreveport Company in making the appropriation of said public square." (underline added by undersigned counsel). See, Exhibit B of Exhibit 10, p. 76 (Memorandum in Support of Motion for Summary Judgment).  Clearly, this shows that the Caddo Parish Police Jury knew that it had permission from the land owners to use the Public Square for the erection of public buildings.  However, these said minutes clearly further shows that the Caddo Parish Police Jury knew that it did not own Shreveport Block 23; otherwise it would have expressed that it owned it. Since Larkin Edwards' estate still retains ownership of Shreveport Block 23 and he did not sign an authentic Act of Sale, there was no legal way to convey ownership to the Caddo Parish Police Jury without the heirs of Larkin Edwards appointing a succession representative.  However, the heirs of Larkin Edwards could still give permission to the Caddo Parish Police Jury to use Shreveport Block 23; and these said minutes indicate that it did receive permission from the owners Shreveport Block 23 for a "full and complete right to use the Public Square for the erection thereon of the public buildings".  The term "right of use" does not convey or indicate ownership to the Caddo Parish Police Jury.  Furthermore, no Caddo Parish Police Jury minutes or documents show that it appointed a "natural person" to accept possession of Shreveport Block 23 or to sign an authentic Act of Sale or Act of Donation for said Shreveport Block 23.  Therefore, the entire records of the Caddo Parish Police Jury gives no evidence indicating that a legal land transfer of ownership (or possession) had taken place between the owners of Shreveport Block 23 and it;

12).  On November 10, 1856, the Caddo Parish Police Jury minutes states, "...That the building Court House Square Committee is authorized if they see proper, to make certain changes in the Clerk's office in said building, provided it can be done without additional expense, and be it said building, provided it can be done without additional expense, and be it further ordained that said building committee be authorized to let it our contract for grading the public square and making side walking around same, and also to have a cistern constructed and gas fixtures put up in said Court House." Thus, after getting permission from the owners, the Caddo Parish Police Jury authorized the construction of a courthouse on Shreveport Block 23 which was completed by 1860.  However, the use of property for public purposes does not make the property public. See, *Angus McNeil et al., v. Hicks & Howell*, 34 La. Ann. 1090 (La. 1882); and Exhibit 12. In addition, "If the property was dedicated to public use, it reverted to the original owner free from such use by the abandonment of the use."  See, *Angus McNeil et al., v. Hicks & Howell*, 34 La. Ann. 1090 (La. 1882); and Exhibit 12.  Also, the *McNeil* court ruled that, "The use of property for public purpose is servitude...Servitudes are extinguished by abandonment, by renunciation, and by expiration of time ... By prescription resulting from non-use...Servitudes are also extinguished by the renunciation or voluntary release of them by the owner of the estate to which they belong...When the servitude is extinguished the property in full reverts to the original owners. See, *Angus McNeil et al., v. Hicks & Howell*, 34 La. Ann. 1090 (La. 1882)' and Exhibit 12.

13).  Although the Caddo Parish Police Jury had no ownership in 1903, the Caddo Parish Police Jury "gave" the small plot of land where the Confederate Monument currently stands to the Plaintiff (an agent appointed by the Plaintiff accepted the land and $1,000.00);

14).  In May, 1954, Shreveport real estate broker Ike Lowenthal offered to secure a purchase of Shreveport Block 23 from between $11,000,000 to $15,000,000; but the news like "Parish historians do not know just what right the parish had for use of this "public square" as the site for the courthouse and no records are known to exist" helped to bring negotiations to an end. See, Exhibit 16, pp. 4 thru 7.

15).  In 1962, the Louisiana Legislature passed La. R.S. 41: 1323.4 (sales, transfers or exchange of public property by cities, towns, villages and police juries prior to twelve o'clock, noon, July 28, 2948).  This statute reads as follows:

§1323.4: All sales, transfers or exchanges or public property made by cities, towns, villages and police juries made prior to twelve o'clock, noon, July 28, 1948 are hereby validated, ratified and confirmed unto the original purchasers or transferees and their successors in title, notwithstanding any informalities provided there is valid consideration therefor.  Added by Acts 1962, No. 205, § 1.

16).  In 2002, United Title of Louisiana, Inc. ("United Title") which found no written conveyances for either the Plaintiff UDC or Caddo Parish to the Caddo Courthouse Square. See, Exhibit 1-2 (A Picture of the Confederate Monument Which Shows that It is Enclosed By a Decorative Fence in 1906), Exhibit 3 (Text Taken from the Minutes of the Caddo Parish

Police Jury Which Gave the Plot for the Confederate Memorial to the Plaintiff); and Exhibit 4 (Property Title Opinion for Block 23 (i.e. Court Courthouse Square)).  Hired by the Caddo Parish Commission itself United Title concludes that, "...acquisitive prescription would have long since prevailed over any flaw in the dedication of the subject tract." See, Exhibit 4.  Thus, the said title opinion in effect reiterates that the Plaintiff has ownership of the land where the Confederate Monument currently sits because the title opinion did not exclude the Plaintiff as an owner;

17).  On October 19, 2017, Defendant passed Resolution No. 69.  Resolution No. 69 further authorizes "the Parish Administrator, assisted by the Parish Legal Staff, to pursue any and all legal means to remove the monument from the Caddo Parish Courthouse Square; and it would go into effect immediately".  (See, Exhibit 1: The full text of Resolution No. 69 is on the final page of Exhibit  1).  In addition, Resolution No. 69 does not permit the Plaintiff to appeal it in violation of the Plaintiff's rights to due process and equal protection under the Fifth and Fourteenth Amendments.  Resolution No. 69 does not meet the burden of the governmental body Defendant Commission when it seeks to regulate the place of speech in the Plaintiff's private forum which denies Plaintiff its' message (i.e. Confederate Monument) in a place closely associated with it (i.e. the site of the last  Confederate flag to fly at a Confederate capital).  Plaintiff wants to communicate a message that is directly related to its property which is located within the Caddo Parish Courthouse Square;

18).  According to deposition testimony of Caddo Parish Commissioner Stephen Jackson, he did not believe that Resolution No. 69 had violated the First, Fifth, and Fourteenth Amendment rights of the Plaintiff.  See, Exhibit 21, pp. 70-76 (Deposition of Caddo Parish Commissioner Stephen Jackson).  And according to deposition testimony of the Caddo Parish Administrator and CEO of Caddo Parish Dr. Woodrow Wilson, Jr., he admitted that Resolution No. 69 gave Caddo Parish the power to order the removal of the Confederate Monument.  See, Exhibit 22, pp. 65-66 (Deposition of Dr. Woodrow Wilson, Jr.); and

19).  On April 19, 2018, Plaintiff signed a Quitclaim Deed with four (4) heirs of Larkin Edwards which confers an ownership interest on the Plaintiff.  See, Exhibit 23 (Quitclaim Deed).  Thus,  as a matter of law Plaintiff has a written instrument which conveys an ownership interest in the land underneath the Confederate Monument.

## LAW OF SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure authorizes this Court to grant judgment as a matter of law where there is no genuine issue as to any material fact. An issue is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, the moving party must establish that no such issue remains for trial, even if the evidence is viewed in the light most favorable to the non-moving

party. See *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1187 (2d Cir. 1987).   Summary judgment should be rendered only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A factual dispute is material only if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   Whether a genuine issue of material fact is presented will be determined by asking if a reasonable jury could return a verdict for the non-moving party. Id. When evaluating a motion for summary judgment, the facts are to be construed in a light most favorable to the non-moving party.   *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U. S. 574, 587 (1986). The district court must not "resolve factual disputes by weighing conflicting evidence...since it is the province of the jury to assess the probative value of the evidence." *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir. 1980). Summary judgment is improper where the court merely believes it unlikely that the non-moving party will prevail at trial. *National Screen Serv. Corp. v. Poster Exchange, Inc.*, 305 F.2d 647, 651 (5th Cir. 1962).   "Our common law brothers have the rule of stare decisis.   Such rule does not prevail in Louisiana.  Each case must stand or fall on its own facts."  See, *Lee v. Jones*, 69 So.2d 26 (La. 1953). However, stare decisis prevail over some of the legal issues in the instant matter.

### I.  LAWS CONCERNING THE REASONS CADDO PARISH DOES NOT OWN SHREVEPORT BLOCK 23

**A.  There is no evidence that Caddo Parish owns Shreveport Block 23 in its entirety.**

The land that makes up the City of Shreveport originated from the aboriginal title held by the Caddo Indians.  After Larkin Edwards acquired his floating reservation of 640 acres via the treaty between the Caddo Indians and the U.S. government in 1835, he sold his reservation to Angus McNeil

and seven other men who later formed the Shreve Town Company in 1836.  However on March 14,1840, Larkin Edwards signed a document which declared that sale to be null and void.  See, Exhibit A of Exhibit 10, p. 400.  In 1841, Larkin Edwards died without signing an authentic Act of Sale for his floating reservation of 640 acres; and therefore, he never conveyed Shreveport Block 23 to the Angus McNeil and the other owners of the Shreve Town Company.  Larkin Edwards died leaving about 200 acres of property in northwest Louisiana.  And the heirs of Larkin Edwards have never opened a succession for the estate of Larkin Edwards.  Although based on other evidence eminent historian Dr. Gary Joiner concludes that, "The Caddo Parish Commission (Louisiana does not have the right or authority to move, relocate, harm or otherwise endanger the Caddo Parish Confederate Monument located on the [grid] north lawn of Block 23 of the original plat of Shreveport. I contend that the Caddo Parish Commission does not own Block 23 , and certainly not the northern portion of that block. It is not theirs to control. There are three interwoven reasons for this assertion. First, Downtown Shreveport property did not belong to the United States government, the State of Louisiana, or private individuals. It was separated from the  Sovereign, which was the Caddo Nation of Native Americans. Second, Block 23 was given to the Caddo Indian Agent, Larkin Edwards, in 1835 to be held forever by him and his heirs. Third, the United Daughters of the Confederacy (UDC) have maintained a continuous, uninterrupted servitude on the monument grounds since 1906, making them the owners and operators of that plat for 112 continuous years."  See, Exhibits 15, 15-A, & 15-B (Dr. Gary Joiner, Ph.D).

Furthermore for purposes of the ten (10) years prescription because the Defendant does not possess a just title (i.e. legal and transferable title).  Thus without a legal and transferable title and good faith, the Defendant could not acquire ownership of Shreveport Block 23 pursuant to La. C. C. (1870) Art. 3474.  As for the thirty (30) years prescription term, the "ownership of immovables is prescribed for by thirty years without any need of title or possession in good faith." See, La. C.C. Art. 3499.  And

12

"The possession on which this prescription is founded, must be continuous and uninterrupted during all the time; it must be public and unequivocal, and under the title of owner".  See, La. C.C. (1870) Art. 3500.  And the time "for prescription is reckoned by days and not by hours.  See, La. C.C. (1870) Art. 3467.   And since the Caddo Parish Police Jury is a parochial corporation, it must appoint a natural person to accept possession of Shreveport Block 23.  See, La. C.C. (1870) Art. 439.  Defendant has not offered any evidence that it appointed anyone to accept Shreveport Block 23 on behalf of it.   In deposition testimony the Caddo Parish administrator admitted the parish did not designate a person to accept Shreveport Block 23 on behalf of the Defendant.  See, Exhibit 22, p. 14.  Thus, without neither possession nor evidence that it did not have permission of the actual owner of Shreveport Block 23 prescription had never commenced.   But there may have been precarious possession because the evidence suggests that the Caddo Parish Police Jury had permission of the owners to build public buildings on Shreveport Block 23.  The Civil Code defines precarious possession as "[t]he exercise of possession over a thing with the permission of or behalf of the owner or possessor."  See, La. C. C. Art. 3437.  However, precarious possession is insufficient for acquisitive prescription.  See, *Boudreaux v. Cummings*, 167 So. 3d 559, 562 (La. 2015)(explaining that if Boudreaux suffered from legal presumption, possessed precariously, and had not followed the requisite steps to cure that precariousness, he could never prescribe); and La. C.C.  Art. 3477 ("acquisitive prescription does not run in favor of a precarious possessor of his universal successor").  Furthermore, not one version of the Caddo Parish Police Juries had been in existence for the thirty (30) years needed to for acquisitive prescription.  Although the first version of the Caddo Parish Police Jury came into being in 1838, it came to an end with a passage of a new state constitution in 1852.  The second version came to end when Louisiana left the union on January 26, 1861.  The Louisiana Constitution of 1868 Article 148 declared the succession to be null and void; and Article 15 established the new government as required

13

by Congress.  See, Exhibit 24.  And the courts established by the Constitution of 1868 clearly viewed

the former Confederacy as an illegal government.  For example, in a case that involved a plaintiff who

sued for a payment of a promissory note made by the defendant.  The defendant paid this said note in

full with Confederate monies to the Confederate States Receiver at Shreveport in 1862.  The plaintiffs

filed suit because "the said collection by the Confederate States Receiver did not extinguish their claim."

However, the Louisiana Supreme Court ruled in favor of the defendant because "The payment of a

promissory note to a receiver of the so called Confederate States, under compulsion, during the late war,

in an unlawful currency, does not interrupt prescription, and the action to recover on the note is therefor

barred by five years."  See, *New York Belting and Packing Company v. T.W. Jones*, 22 La. Ann. 530

(La. 1866).  Thus, the Confederate version of the Caddo Parish Police Jury was considered unlawful

by the government established by the Constitution of 1868.  The next constitution, the Louisiana

Constitution of 1879 reestablished home rule.  Its Article 192 set the time for the election of the new

parochial and municipal corporations; and its Article 234 ordered that all corporation charters were

subject to the provisions of the new constitution.  Thus, the Constitution of 1879 extinguished the legal

existence of the Caddo Parish Police Jury established under the Constitution of 1868.  Next the

Louisiana Constitution of 1898 expressly exempted the courts from the dissolution of the other

government entities with the words, "...[court] shall be construed to be the same courts created" by the

Constitution of 1879.  Therefore, only the courts and not the parochial corporations like the Caddo

Parish Police Jury could be considered the same as the ones created by the previous constitution of

1879.  And no version of the Caddo Parish Police Juries had an overlapping of existence.  So, there was

an interruption of precarious possession and no tacking.  Thus, even if the Caddo Parish Police Jury had

appointed someone to accept possession of Shreveport Block 23 there could be no ownership vis

acquisitive prescription before 1907 (because the Caddo Parish Police Jury did not exist from 1861 till

1877 with the return of home-rule).  However, the evidence in the public records suggests that Shreveport Block 23 was dedicated for the site of the courthouse and the Defendant has concedes it.

In the instant matter, the Defendant concedes that "The deeds, maps and United Title Opinion show that Block 23 has always been <u>dedicated</u> as a public square within the City fo Shreveport/Parish of Caddo, even if the <u>dedication</u> may not have been perfected until 1845...Therefore Defendant contends that it has always owned this property by virtue of the public <u>dedication</u>. (underline added by undersigned counsel)"  See, Exhibit 10, p. 4.  "Long silence of parties pretending ownership of property converted to public use, and the peaceable and uninterrupted use and possession by the public, is evidence of dedication of the property to the public for public use...No deed or act of conveyance is necessary to dedicate land or rights in immoveable property to the public...The dedication of property for public use may be inferred from facts and circumstances, which leave no reasonable doubt upon the mind of the intention of the owner to make such a disposition...There is no particular form necessary to a dedication of land to public uses.  All that is required is the assent of the owner of the land, and the fact of it being used for the purpose intended."  See, *Pickett et al. v. Brown et al.*, 18 La. Ann. 560 (La. 1866); and Exhibit 19.  However, the use of property for public purposes does not make the property public.  See, *Angus McNeil et al., v. Hicks & Howell*, 34 La. Ann. 1090 (La. 1882); and Exhibit 12. In addition, "If the property was dedicated to public use, it reverted to the original owner free from such use by the abandonment of the use."  See, *Angus McNeil et al., v. Hicks & Howell*, 34 La. Ann. 1090 (La. 1882); and Exhibit 12.  In addition, the *McNeil* court ruled that, "The use of property for public purpose is servitude...Servitudes are extinguished by abandonment, by renunciation, and by expiration of time ... By prescription resulting from non-use...Servitudes are also extinguished by the renunciation or voluntary release of them by the owner of the estate to which they belong...When the servitude is extinguished the property in full reverts to the original owners.  See,  *Angus McNeil et al., v. Hicks &*

15

*Howell*, 34 La. Ann. 1090 (La. 1882)' and Exhibit 12.  And according to Plaintiff's expert Mr. Wayne

Webb, attorney at law, he wrote his following conclusion:

> "...the action of the Caddo Parish Police Jury in 1903, in reserving a plot
> of ground for the Daughters of the Confederacy, may have taken the property
> out of the purview of use as a public square as set forth in the original plat
> filing, because use of the plot of ground was then for the endeavors of a private
> entity.  Pursuant to R.S. 33:4178, the action of the police jury may have
> been tantamount to a revocation of the dedication, which would have caused
> the ownership to revert back to those who dedicated the land.  Under those
> circumstances, the Daughter of the Confederacy would have been occupying
> the respective plot without the permission of the true owners, thereby causing
> acquisitive prescription to run in favor of the Daughters of the Confederacy.
> From a standpoint of what I would require to issue a title insurance police upon
> a tract of land such as this, I would require a judicial determination that the
> Daughters of the Confederacy have satisfied the elements of acquisitive
> prescription."

Besides Defendant conceding that a dedication of Shreveport Block 23 took place for purposes

of providing a site for the Caddo Parish Courthouse (instead of possession of said Block), the public

record shows that Larkin Edwards still retained ownership of Shreveport Block 23 at the time of his

death.  On June 18, 1903, Plaintiff followed the proper formalities to accept the land underneath the

Confederate Monument.  Plaintiff appointed W.H. Wise to accept possession of the $1,000 donation

and the "front plat".  The land underneath the said monument would not be for public purposes; and

Plaintiff intended to possess said land as owner.   According to testimony of the Caddo Parish

administrator, no court proceedings have taken place on the site of the Confederate Monument; and no

public monies have been used for the upkeep of it.  See, Exhibit 22, pp. 20-21.  And since the Caddo

Parish Police Jury did not own Shreveport Block 23 and voluntarily relinquished the "front plat"; and

Plaintiff did not have permission from the owners of said Block, Plaintiff had acquired the land

underneath the Confederate Monument by acquisitive prescription.  And in April, 2018, Plaintiff had

signed a Quitclaim Deed with some of the heirs of Larkin Edwards which gives it an ownership interest

in the land underneath the Confederate Monument as a matter of law.  Thus, it is material dispute of

facts concerning the ownership of the land underneath the Confederate Monument since the Defendant

still claims ownership despite the lack of evidence.

**B.  There is no law that supports Caddo Parish's ownership of  Shreveport Block 23 in its entirety.**

Defendant has no evidence that it can assert ownership via acquisitive prescription.  In addition

Defendant concedes that Shreveport Block 23 is dedicated for the Caddo Parish Courthouse; and its

predecessor relinquished the dedication of the land underneath the Confederate Monument to Plaintiff

in 1903.  Furthermore in 1962, the Louisiana Legislature passed La. R.S. 41: 1323.4 (sales, transfers

or exchange of public property by cities, towns, villages and police juries prior to twelve o'clock, noon,

July 28, 2948).  Thus, prescription,  La. R.S. 41: 1323.4, and the Quitclaim Deed confer ownership.

## II.  LAWS CONCERNING PLAINTIFF'S FIRST, FIFTH, AND FOURTEENTH AMENDMENT CLAIMS

**A. The removal of the Confederate Monument is not subject to any reasonable time, place, or manner restrictions.**

Freedom of speech "is subject to reasonable time, place, or manner restrictions...[R]estric-

tions of this kind are valid provided that they are justified without reference to the content of the

regulated speech, that they are narrowly tailored to serve a significant government interest. And they

leave open ample alternative channels for communication of the information."  *Clark v. Community*

*for Creative Non-Violence*, 468 U.S. 288, 293 (1984).  In the instant matter, the Defendants restricted

the Plaintiff's First Amendment rights on the Plaintiff's privately owned property without providing

either just compensation or an alternative channel for communication of the information.  Resolution

No. 69 states, "...although historically significant, citizens would be better served if the monument was

placed in a museum or at another site dedicated to memorials, instead of the Courthouse where justice

is to be administered fairly and impartially."   See, the final page of Exhibit 1.  Furthermore the Defendants made references to the content of the regulated speech contained in Resolution No. 69. Resolution No. 69 clearly states "...the Confederate Monument currently on the lawn of the Caddo Parish Courthouse serves as an object of division and a painful reminder of racial inequalities locally and nationally [.]" See, the final page of Exhibit 1.  Thus, Defendants' Resolution No. 69 is not tailored to serve a significant government interest regulating Plaintiff's First Amendment rights from its' own private property; and therefore it did not leave Plaintiff an ample alternative means to communicate its' message since there can only be one location for the spot where the last flag flew from a Confederate capital.  Therefore, the private property of the Plaintiff where its' Confederate Monument sits is inextricably linked to the content of its message.

In addition, since Resolution No. 69 did not permit the Plaintiff to appeal the Defendants' arbitrary and capricious decision as to be unreasonable and oppressive, it constituted a violation of the Plaintiff's rights to due process and equal protection under the Fourteenth Amendment.  And finally, Resolution No. 69 did not permit the Plaintiff to receive just compensation for the taking by the governmental body of Plaintiff's private property in violation of the Plaintiff's rights to just compensation under the Fifth Amendment.

**B**. **The Defendant's decision to remove the Confederate Monument from its private property was based on the content of its' speech in violation of the First Amendment.**

The principal inquiry in determining content-neutrality in speech case generally, and in time, place, or manner cases is whether the government had adopted a regulation of speech because of disagreement with the message it conveys.  See, *Community for Creative Non-Violence*, supra, at 468 U.S. 295.  The government's purpose is the controlling consideration.  A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some

18

speakers or messages, but not others.  See, *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 475 U.S. 47-48 (1986).  Government regulation of expressive activity is content-neutral so long as it is "justified without reference to the content of the regulated."  See, *Community for Creative Non-Violence*, supra, at 468 U.S. 293 (emphasis added); *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981) (quoting *Virginia Pharmacy Bd. v. Virginia Consumer Council,* 425 U.S. 748, at 425 U.S. 771 (1976); see *Boos v. Barry*, 485 U.S. 312, 485 U.S. 320-321 (1988) (opinion of O'CONNOR, J.).  *Ward v. Rock Against Racism*, 491 U.S. 781, 792 (1989).

Defendant's decision to order the removal of the Confederate Monument from the Plaintiff's private property stems from an unsupported belief that the Confederate Monument represents slavery. The Defendant's expressed this belief and provided not evidence as a basis for such which shows that their actions were not content-neutral.  This conclusion is bolstered by the wording of Resolution No. 69 which states, "...the Confederate Monument currently on the lawn of the Caddo Parish Courthouse serves as an object of division and a painful reminder of racial inequalities locally and nationally."  See, Exhibit 1, final page.  In addition in deposition testimony of the Caddo Parish Administrator Dr. Woodrow Wilson admitted that the Confederate  Monument did not cause civil unrest.  See, Exhibit 22, p. 55.  Also, he does not believe that the UDC is a racist organization.  See, Exhibit 22, p. 19.

**C.  The Defendant's action is not narrowly tailored under the First Amendment.**

There must be a balance between the ability to have the place of the message be part of the message and legitimate government concerns such as maintaining order or protecting the community against violence.  See, *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 294 (1984). Defendants' decision does not provide for any alternative for the Plaintiff to express either its' speech or beliefs.  Therefore, Resolution No. 69 contains vague, overly broad, and ambiguous language which leave no narrowly tailoring under the First Amendment.

**D.  The Defendant's action has no rational basis under the First Amendment.**

The Defendants are relying on the fact that opponents of the Confederate Monument believe that it symbolizes slavery.  However, neither the Defendant nor the opponents of the Confederate Monument have provided any rational basis to support this argument.  The federal government has published the interviews of former slave.[1]  And out of all of the interviews (only a few were from Louisiana) not one former slave claimed that either the Confederate Monument or other Confederate Memorials represented slavery.  In addition, none of the interviewees called for the removal of any of the Confederate Memorials either.

Furthermore in the instant matter on September 18, 2017, the Defendant Caddo Parish Commission's Long Range Planning Committee rejected the proposal of their citizens advisory committee which advised keeping the Confederate Monument at its present location.  Thus, the Defendant's opposition to Plaintiff's viewpoint has neither a rational nor historical basis for its decision.

**E.  The Defendant's action empowers the interest of hecklers over the free speech rights of the Plaintiff.**

The Defendants are relying on the fact that opponents of the Confederate Monument believe that it symbolizes slavery.  In the past the Confederate Monument has attracted vocal protestors (i.e. opponents of the said monument to the meetings) held by the Defendant Caddo Parish Commission.  There is no place for a "hecklers' veto" under the First Amendment.  The "heckler's veto" has been rejected by the Supreme Court of the United States as a legitimate basis for infringing upon First

---

[1]  Born in Slavery: Slave Narratives from the Federal Writers' Project, 1936 to 1938, Library of Congress Digital Collection, accessed October 31, 2017, https://www.loc.gov/collections/slave-narratives-from-the- federal-writers-project-1936-to-1938/about-this-collection/.

Amendment rights.  See, *Cox v. Louisiana*, 379 U.S. 536 (1965).  At the same time, the Fourth Circuit has recognized that government officials may restrict expressive activity because of a threat of violence but only if they have a reasonable belief that violence is imminent by those whose expression they seek to restrict.  See, *Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. Stuart,* 934 F.2d 318 (4th Cir. 1991)(heckler's veto not involved because real "threat" of violence was from Klan not spectators).

In the instant matter, Plaintiff UDC has not been involved with any violence associated with its ownership of the Confederate Monument.  Rather any real threat has come from the opponents of the Confederate Monument as evidenced by an act of vandalism committed on July 7, 2016.  See, Exhibit 8 and Exhibit 8-1.  The Defendant must show that its decision to order the removal of the Confederate Monument was based a reasonable belief that the Confederate Monument, plans and actions constitute an imminent threat to public safety.  But no evidence supports that the Confederate Monument constitutes an imminent threat; rather evidence supports that the opponents of the Confederate Monument constitute an imminent threat instead.  In this instance hecklers and vandals have shut down free speech with which they disagree by manufacturing a threats to public safety.

### F. The Defendant's action constitutes a prior restraint on Plaintiff's speech under the First Amendment and violates Due Process under the Fourteenth Amendment.

The elimination of prior restraints was a "leading purpose" in the adoption of the First Amendment.  See, *Lovell v. Griffin*, 303 U.S. 444, at 451-452 (1938).  The Defendant's decision to order the removal of the Confederate Monument without any announced procedural safeguards being in place to allow Plaintiff to contest the removal of the Confederate Monument constitutes prior restraint.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  See, *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  The violation of First

Amendment rights cannot be fully compensated later by damages.  See, e.g. *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011).  In the Fourth Circuit, "[v]iolations of [F]irst [A]mendment rights constitute per se irreparable injury."  See, *Johnson v. Bergland*, 86 F.2d 993 (4th Cir. 1978).  Plaintiff is asking this Honorable Court to adopt the reasoning found in the preceding Fourth Circuit case.

Besides having no procedural safeguards were in place to allow the Plaintiff to contest the removal of the Confederate Monument.   The Defendant made no effort to provide a rational  basis for their decisions other than to state that the Confederate Monument represents slavery based on information from unspecified sources.  And the Defendant relies on *Akin* which neither excludes the ownership of Plaintiff nor confer ownership of Shreveport Block to the Defendant.  See, Exhibit 9.

### G.  The Plaintiff will suffer irreparable harm if the monument is removed and a deprivation of its Fifth Amendment rights.

Here time and costs are of the essence to protect Plaintiff's rights because of the fragility of the Confederate Monument, the huge costs to repair any damages to the Confederate Monument, the huge costs to pay for the removal and proper storage of the Confederate Monument; and the fact that Resolution No. 69 came into effect immediately after its' passage on October, 19, 2017.  See, Exhibit 8-1.  And judging by the damages caused by a vandal in 2016, the Confederate Monument's marble appears to fracture easily; and can only be cleaned with a non-ionic bio cleaner because marble dissolves in mild acid and cleaning the gypsum crust on marble can result in a great loss of surface.  See, Exhibit 8-1 (Email from Charles A. Phillips to Jackie Nichols on August 3, 2016).  And any permanent damage that results from removal from public view will silence history and a view from the past.

The over one hundred year old Confederate Monument cannot be removed without it suffering expensive damages to its' structure.  Plaintiff's intended message will not be communicated and it will

suffer a huge financial loss because of the damages caused by its' removal.  A delay would be "tantamount to an effective denial of First Amendment rights."  See, *Fernandez v. Limmer*, 663 F.2d 619, 628 (5th Cir. 1981), cert. Dismissed, 458 U.S. 1124 (1982).  Defendants' Resolution No. 69 does not provide for any funding to compensate Plaintiff for the cost of removal, damages to the Confederate Monument, and proper storage of the said monument.

Based on the study conducted by Plaintiff's expert master stone mason Mr. Michael Drummond Davidson analyzed "the Civil War Memorial located in Caddo Parish, Louisiana (a/k/a Caddo Parish Confederate Monument) he found micro cracking to be evident in both granite and marble of said memorial.  And as a result of his "visual condition survey and masonry evaluation of the granite and marble", he concludes that further lab testing be done so the monument can be preserved intact; and "it would be unwise to take the said memorial down until lab work tells us more." See, Exhibit 18 &18-A. He wrote the following"

> "...found micro cracking to be in evidence in both the granite and marble. Some of it has expanded because of rust jacking (extreme pressure from rusting ferrous pins) that causes the micro cracks to enjoin with natural voids.  Further lab testing will bear this out.
>
> Left dormant the shearing and failure of Llano granite will be slow. However should the monument be moved 'or pulled apart by the pull stress of a crane;' these existing shears will expand and craze towards the setting beds and their anchors.  When this happens, the stress quadruples so that The stones will completely fissure and shear apart.  We know of no one in stone industry that has not seen this happen with older stone."  See, Introduction to Exhibit 18.

Mr. Davidson estimates that it would cost $1,260,000.00 (without the cost of the new location) for the insurance and removal of the Confederate Monument.  See, Exhibit 18, pp. 8-10.  Resolution does not provide for taxpayers' monies to pay for the removal.  Therefore, without a hearing or due process Plaintiff has to bear the costs or removal, storage, and damages to the Confederate Monument.

Thus, Defendants' Resolution No. 69 constitutes an unconstitutional taking of Plaintiff's property in violation of the Fifth Amendment which requires that the power of eminent domain be coupled with "just compensation" for those whose property is taken.  See, *Kelo v. City of New London*, 545 U.S. 469 (2005).  However, the instant matter is distinguishable from *Kelo* because the Defendant have not found Plaintiff's private property to be either blighted or abandoned.  Therefore, the Defendant have no legal grounds for taking the Plaintiff's private property pursuant to the Fifth Amendment.

Since disassembly of the Confederate Monument would destroy its value, it has to be moved in one piece.  As a practical matter a retired ceiling and wall design engineer and Plaintiff's expert Mr. William Nichols studied and measured the said monument in order to determine its weight (and lifting capacity needed to move it).  He determined that the said monument weighed 62.9-tons and wrote the following:

> "It is essential that the lifting equipment hired to move the monument be sized based on this largest "worst case" size of approximately 63-tons plus whatever measure of safety is applied to their equipment.  If a 15% (85% if capacity) safety factor is applied 72.5-tons must be used to determine the lifting capacity of the equipment hired.  The monument is 30 foot tall and must clear 40 foot tall trees, thus the worst case calls for a 70 foot lift.

> "...I feel that moving the Caddo Parish Monument poses many potential risks of damage, loss of property, logistics problems as well as legal issues and costs to the parish and its taxpayers and should not be attempted."  See, Exhibit 14, pp. 1-6.

**H.  The Defendant cannot raise government speech as a defense in the instant matter because Caddo Parish does not own the land underneath the Confederate Monument.**

As a matter of law Plaintiff has an ownership interest (and ownership via acquisitive prescription) in the land underneath the Confederate Monument.  Defendant has neither produced evidence that Shreveport Block 23 has ever been public property nor produced evidence of a just title for said Block.  If the Defendant claim government speech as a defense to a lawsuit in the instant matter, their argument is contrary to the well-established law regarding private property, public forums,

parades, and public demonstrations.  In *Matel v. Tam*, ___ *U.S.* ____, slip op. 15-1293, p. 14 (June 19, 2017), the Supreme Court cautioned "If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." If such a standard was to be upheld, then the Defendant can order anyone in Caddo Parish to remove any signs, outside holiday displays, religious expressions, patriotic displays, the American flag and any other viewpoints that they disagree with from one's private property denying due process, equal protection, and without just compensation for the private property owner.  Most recently, in *Kessler v. City of Charlottesville*, Civ. No. 3:17cv0056, August 11, 2017, the Court found that the City of Charlottesville could not revoke the permit for a group because the Defendant City did not like the Plaintiff's message.  Courts have repeatedly recognized that the vindication of First Amendment rights is a significant public interest.  See, e.g. *Giovani Carondola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)("upholding constitutional rights surely serves the public interest."' *Christian Legal Society v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("[I]njunctions protecting First Amendment freedoms are always in the public interest."); *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005); *Pacific Frontier v. Pleasant Grove City*, 414 F.3d 427, 436 (6th Cir. 2004)("the public interest is served by preventing the violation of constitutional rights.")

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment should be denied.

Respectfully Submitted:

//Dick "Dave" Knadler//

_____
Dick "Dave" Knadler, Bar Roll #27829
3223 First Street
Mansfield, Louisiana 71052
(318) 925-1178
dknadler@hotmail.com

CERTIFICATE

I hereby certify that a copy of the above and foregoing has been served upon all attorneys of

record in either the U.S. Mail or electronically this 22nd  day of June, 2018.

Respectfully Submitted:

//Dick "Dave" Knadler//

_____

Dick "Dave" Knadler, Bar Roll #27829