UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| SHREVEPORT CHAPTER #237 OF THE UNITED DAUGHTERS OF THE CONFEDERACY | CASE NUMBER: 17-CV-01346 |
| Plaintiff, | JUDGE: ROBERT G. JAMES |
| VERSUS | |
| THE CADDO PARISH COMMISSION, ET AL. | MAGISTRATE JUDGE: MARK L. HORNSBY |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF FILING SURREPLY AND REQUEST FOR ORAL ARGUMENTS FILED BY THE PLAINTIFF**

MAY IT PLEASE THE COURT:

For in response to the Defendant's inaccurate characterization of law and historical facts in its Defendant's *Reply Memorandum to Opposition to Motion for Summary Judgment*. The time-line of some of the pertinent events in the history of Shreveport Block 23 is the following:

1). On July 1, 1835, the Caddo Indians signed a treaty with the United States. This treaty recognized a grant by the Caddo Indians of a floating reservation of 640 acres to their interpreter Larkin Edwards. The aboriginal title held by the Caddo Indians conveyed to Larkin Edward a floating reservation of of 640 acres which included what later became known as Shreveport Block 23;

2). On January 26, 1836, the United States ratifies said treaty; and President Andrew Jackson proclaimed it on February 2, 1836. The United States government recognizes such "fees simple title to all the rights which the Caddoes had in these lands." See, *United States v. Brooks*, 51 U.S. 442 (1850);

3). On February 3, 1836, Larkin Edwards allegedly sold his interest in his said floating reservation of 640 acres to Angus McNeil and seven others for five (5) thousand dollars;

4). On February 7, 1837, Angus McNeil and these seven (7) others incorporated the Shreve Town Company a/k/a the Shreveport Town Company ("Shreve Town Company") in order to sale and manage those original 64 lots (which is the entire original 640 acres owned by Larkin Edwards and conveyed to him by treaty from the Caddo Indians). However, neither Larkin Edwards nor the Shreve Town Company <u>ever laid claim to</u>

1

ownership of the "open space" as public property by an ordinance passed on November 14, 1848. This "open space" included Lot 70 which was later the subject of litigation in *City of Shreveport v. Walpole.* See, *City of Shreveport v. Walpole,*, 22 La. Ann. 526 at 527 (La. 1870);

5). In 1837, the Shreve Town Company "laid off the town of Shreveport, at Bennet & Cane's Bluff, on the south side of the Red River, upon the location made there of the grant to Larkin Edwards; that the town was incorporated by act of the [Louisiana] Legislature, passed in 1839;"

6). On August 9, 1836 (certified as a true copy of an original on file on March 13, 1840 and filed on May 17, 1840) Angus McNeil, who was one of the owners of the Shreve Town Company, signed a document "Who declared that whereas at the time the foregoing act of sale or deed was passed to him by Larkin Edwards, he was not aware that it was perhaps necessary that he should have signed the same as accepting and that in order to remedy this defect if in all its clauses, stipulations and conditions." (See, Doc. 88-3, p. 5). However, neither Larkin Edwards nor the other seven (7) owners of the Shreve Town Company signed this said document;

7). On June 7, 1839 (certified as a true copy of an original on file on March 14, 1840 and filed on June 12, 1845), Larkin Edwards signed a document which declared that the alleged sale of his floating reservation of 640 acres to Angus McNeil, Bushrod Jenkins, to the Commercial firm of Bennet & Cane composed of William Smith Bennet and James Huntington Cane, Thomas Taylor Williamson, Sturgis Sprague, James Betan Pickett, and to Captain Henry M. Shreve to be "null and void and as though the same had never been passed, and I [i.e. Larkin Edwards] do hereby further bind myself, my heirs, executors and administrators, to pass and sign an authentic Act of Sale of the above mentioned tract of land before any Notary or other public officer duly authorized to receive and record contracts in the said State whenever I or they do hereby required to do so." See, Doc. 88-3, pp. 6 & 7. However, unlike the document mentioned in the above-referenced Paragraph 6)., Larkin Edwards, Angus McNeil, Bushrod Jenkins, Captain Henry M. Shreve, William Smith Bennet, James Huntington Cane, Thomas Taylor Williamson, Sturgis Sprague, and James Netan Pickett signed this said document which declared the alleged sale of his floating reservation of 640 acres to be "null and void and as though the same had never been passed." See, Doc. 88-3, pp. 6 & 7.(Note that Plaintiff erroneously stated in that Larkin Edwards signed the said document on March 14, 1840 in Doc. 90, p. 7; but the correct date is June 7, 1839);

8). There is no record that Larkin Edwards signed an authentic Act of Sale necessary for the sale of his floating reservation of 640 acres to anyone. Furthermore, there is no record that any subsequent Act of Sale that credits the $5,000.00 paid to Larkin Edwards (or set any agreed price between the parties required to perfect a sale pursuant to Louisiana Civil Code (1825) Article 2431) had taken place. Therefore, Larkin Edwards never relinquished the ownership of the unsold lots (including Shreveport Block 23).

2

And no records exists showing that anyone had sold Shreveport Block 23 to the Caddo Parish Police Jury;

9). At age 51, Larkin Edwards died in 1841. Leaving a small succession of 242 acres of land, slaves and personal property, his six (6) heirs voluntarily partitioned his property prior to opening his succession; but later a district court declared those partitions null. See, *Wright and Williams v. Mrs. M.D.C. Cane, et al.*, 18 La. Ann. 579 (La. 1866). There is no record that the six (6) heirs opened a succession for the estate of Larkin Edwards. Thus, possibly over one hundred of his heirs still have an ownership interest in Shreveport Block 23;

10). The Shreve Town Company remained in existence until December 14, 1841, whereby the decree of judicial partition was rendered and "the partition was effected on the 10th of May, 1843.";

11). After May 10, 1843, no sale of Shreveport Block 23 to Caddo Parish had taken place;

12). Five years after the death of Larkin Edwards and on June 2, 1846, the Caddo Parish Police Jury minutes states, "From inquiry your Committee have been led to believe that the title vested in the Parish of Caddo to the lot of ground know as the public square [i.e. Shreveport Block 23] is of <u>too precarious and uncertain a character to justify the erection of any public building there.</u>" (underline added by undersigned counsel). Since Larkin Edwards never signed an authentic Act of Sale for his said floating reservation by 1841, there is no evidence of a title which "vested in the Parish of Caddo" in 1846;

13). On August 3, 1846, the Caddo Parish Police Jury minutes states, "The undersigned appointed a Committee to investigate the title vested in the Public Square [i.e. Shreveport Block 23] in the Town of Shreveport, in and to the Parish of Caddo, beg leave to report that their investigation has resulted in a full conviction that the Police Jury of said Parish has <u>full and complete right to use the Public Square for the erection thereon of the public buildings</u> as was originally designed by the Shreveport Company in making the appropriation of said public square." Therefore, the entire records of the Caddo Parish Police Jury gives no evidence indicating that a legal land transfer of ownership (or adverse possession) had taken place between the owners of Shreveport Block 23 and it;

14). On November 10, 1856, the Caddo Parish Police Jury minutes states, "...That the building Court House Square Committee is authorized if they see proper, to make certain changes in the Clerk's office in said building, provided it can be done without additional expense, and be it said building, provided it can be done without additional expense, and be it further ordained that said building committee be authorized to let it our contract for grading the public square and making side walking around same, and also to have a cistern constructed and gas fixtures put up in said Court House." Thus, after getting permission from the owners, the Caddo Parish Police Jury authorized the construction of a courthouse on Shreveport Block 23 which was completed by 1860. However, the use of property for public purposes does not make the property public. See, *Angus McNeil et*

*al., v. Hicks & Howell*, 34 La. Ann. 1090 (La. 1882); and Exhibit 12.  In addition, "If the property was dedicated to public use, it reverted to the original owner free from such use by the abandonment of the use."  See, *Id.*;  Also, the *McNeil* court ruled that, "The use of property for public purpose is servitude...Servitudes are extinguished by abandonment, by renunciation, and by expiration of time ... By prescription resulting from non-use...Servitudes are also extinguished by the renunciation or voluntary release of them by the owner of the estate to which they belong...When the servitude is extinguished the property in full reverts to the original owners.  See, *Id.*;

15).  On June 18, 1903, although the Caddo Parish Police Jury had no ownership of Shreveport Block 23 AND in response to the Plaintiff asking to "be given the front portion of court house square as a site for the monument", the Caddo Parish Police Jury "reserved for that purpose the front plat of court house square" where the Confederate Monument currently stands to the Plaintiff (an agent appointed by the Plaintiff accepted the land and $1,000.00);

16).  In May, 1954, Shreveport real estate broker Ike Lowenthal offered to secure a purchase of Shreveport Block 23 from between $11,000,000 to $15,000,000; but the news like "Parish historians do not know just what right the parish had for use of this "public square" as the site for the courthouse and no records are known to exist" helped to bring negotiations to an end;

17).  On March 31, 1970, the Louisiana Second Circuit of Appeals excluded the City of Shreveport from having an ownership interest in Shreveport Block 23; and "that the police jury has jurisdiction and control over and has actual possession and administration of the property." *Akins et al. v. Caddo Parish Police Jury*, 234 So. 2d 203.  However, the *Akins* court neither conferred ownership of Shreveport Block 23 to the Caddo Parish Police Jury nor did it exclude the ownership interests of the heirs of Larkin Edwards and Plaintiff.  In addition, the *Akins* court did not find that Caddo Parish had <u>adverse possession</u> of Shreveport Block 23.  Furthermore, the subject matter jurisdiction concerning the ownership of Shreveport Block 23 is with the federal courts and not with the courts of Louisiana.  See, *U.S. v. Brooks*, 51 U.S. 10 (1850).[1]

18).  In 2002, United Title of Louisiana, Inc. ("United Title") which found no written conveyances for either the Plaintiff UDC or Caddo Parish to the Caddo Courthouse Square.  Hired by the Caddo Parish Commission itself, United Title concludes that, "...acquisitive prescription would have long since prevailed over any flaw in the

---

[1] ..."That the treaty between the United States and the Caddo Indians on 1 July, 1835, and the articles supplementary thereto, having been ratified by the President and Senate of the United States, is part of the supreme law of the land, and as such must be respected and enforced by the courts of the United States." *U.S. v. Brooks*, 51 U.S. 10 (1850).

dedication of the subject tract." This said title opinion neither excludes the Plaintiff nor the heirs of Larkin Edwards as having an ownership interest in Shreveport Block 23;

19). On April 19, 2018, Plaintiff signed a Quitclaim Deed with four (4) heirs of Larkin Edwards which confers an ownership interest on the Plaintiff.

I. The Defendant Erroneously Relies on *Akin*.

Since the heirs of Larkin Edwards have an ownership interest in Shreveport Block 23, *Akins* is inapplicable because subject matter jurisdiction is with the federal court system. *U.S. v. Brooks*, 51 U.S. 10 (1850).

II. The Defendant Erroneously Asserts that Larkin Edwards Corrected an Error in the Instrument that Purportedly Conveyed His Ownership Interest to the Shreve Town Company.

There is no evidence that Larking Edwards (or all of the owners of the Shreve Town Company) signed any document which allegedly corrected an error in the instrument that purportedly conveyed his ownership interest to the Shreve Town Company. There is no evidence that a sale was perfected from Larkin Edwards to the Shreve Town Company because there was neither credit for the $5,000.00 given to Larkin Edwards nor an agreed price of sale between the parties for a subsequent "authentic Act of Sale." See, Doc. 88-3, p. 6. Furthermore, Larkin Edwards never signed an authentic Act of Sale of his floating reserve of 640 acres to anyone.

III. Defendant Erroneously Asserts that Lot 70 was Part of the Original 640 Acres.

Defendant erroneously relies on *Walpole* where the city of Shreveport acquired ownership of lots when it "took possession and control of the open space [which includes Lot 70] at an early day as public property." *City of Shreveport v. Walpole*, 22 La. Ann. 526 at 527 (La. 1870). However, Lot 70 was neither a part of the 640 acres owned by Larkin Edwards nor did it have an original private owner. *Id.*, at 528.

IV. Defendant Erroneously Rely on *Cole* in Order to Argue that the Confederate Government in Louisiana had an authority to Alienate Land.

Defendant erroneously rely on *Cole* because this case neither finds that the Caddo Parish Police Jury was a legal/lawful entity during the Confederacy nor that the Caddo Parish Police Jury had adverse possession of Shreveport Block 23 during the Confederacy. See, *Cole v. Thompson*, 35 La.Ann. 1026 (La. 1883). In *Cole* the court found that even though Louisiana had left the union, the state government did not forfeit the ownership of land granted to it by the federal government or by another government. Furthermore, the court ratified land grants by the government of Louisiana during the Confederacy. However, this is a narrow finding and the court did not find that Caddo Parish owned Shreveport Block 23(or find that a precarious possessor like the Caddo Parish Police Jury could acquire possession via acquisitive prescription). In addition, the Defendant does not understand that Confederate monies were fiat currency or money. Also besides the Confederate government in Richmond, states and banks in the Confederate States of America issued bank notes too.

In *New York Belting and Packing Company*, the Louisiana Supreme Court referred to Confederate currency as "unlawful." Therefore, when the Louisiana Supreme Court was referring to Confederate currency as "unlawful", the court was referring to the government which backed it. The Editors of Encyclopaedia Britannica define fiat money, "in a broad sense, all kinds of money that are made legal tender by a government decree or fiat. The term is, however, usually reserved for legal-tender paper money or coins that have face values far exceeding their commodity values and are not redeemable in gold or silver."[2] Therefore, an

---

[2] Michael Ray, "Fiat money," Feb 03, 2017, Britannica.com, https://www.britannica.com/topic/fiat-money, (accessed July 9, 2018).

"unlawful" Confederate government's control over Louisiana could not legally interrupt prescription in that said matter. Thus, the Louisiana courts recognized that the state government of Louisiana under the Confederate Government had no lawful existence. *New York Belting and Packing Company v. T.W. Jones*, 22 La. Ann. 530 (La. 1870). Concerning *New York Belting and Packing Company* Plaintiff relies on this case because it shows that the Louisiana Supreme Court viewed the authority of Louisiana's government during the Confederacy as unlawful.

V.  Request for Oral Arguments.

Due to the many historical facts involved plus the parties' reliance on cases and statutes from the 19th century, Plaintiff avers that oral arguments would provide an opportunity for it to answer any questions on the historic facts surrounding this matter.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully request that this Court allow it to file its Surreply and allow oral arguments during the hearing of Defendant's *Motion for Summary Judgment*.

Stonewall, DeSoto Parish, Louisiana, this 10th day of July, 2018.

        Law Office of Dick "Dave" Knadler, LLC
        3223 First Street
        Mansfield, Louisiana 71052

          //Dick "Dave" Knadler//
BY: _____
        Dick Dee "Dave" Knadler, Attorney for
        Louisiana Division Sons of Confederate
        Veterans (SCV)

**CERTIFICATE**

I hereby certify that on the 10th day of July, 2018 a copy of the foregoing Memorandum was filed electronically with the Clerk of Court using the CM/ECF system. Notice of his filing will be sent to all parties by operation of the Court's electronic filing system. //Dick "Dave" Knadler//

_____
**OF COUNSEL**