UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

SHREVEPORT CHAPTER #237                  CASE NO. 5:17-CV-01346
OF UNITED DAUGHTERS OF THE
CONFEDERACY

VERSUS                                   JUDGE ROBERT G. JAMES

CADDO PARISH COMMISSION                  MAG. JUDGE MARK L. HORNSBY

<u>MEMORANDUM RULING</u>

Pending before the Court is a Motion for Summary Judgment, submitted by Defendant, the Caddo Parish Commission, whereby Defendant seeks dismissal of all claims asserted by Plaintiff, Shreveport Chapter #237 of the United Daughters of the Confederacy. [Doc. No. 88]. At its core, the dispute in this matter is whether the Caddo Parish Commission can remove the Confederate Monument which sits on the front plat or portion of the Caddo Parish Courthouse Square.[1] The answer to the question in dispute turns upon what person or entity has the right to control the property upon which the monument sits. By its motion, Defendant contends Plaintiff "cannot demonstrate a property interest in the land upon which the Confederate Monument sits and therefore cannot assert First, Fifth and Fourteenth Amendment Claims." *Id.* at 1. Plaintiff opposes the motion, contending it acquired ownership of the land underneath the monument by acquisitive prescription. For the reasons that follow, the Court finds the Caddo Parish Commission has the authority to remove the monument which sits upon property the Parish holds in trust for public use. Accordingly, Defendant's motion is GRANTED, and Plaintiff's claims are DISMISSED WITH PREJUDICE.

---

[1] On October 19, 2017, the Caddo Parish Commission adopted Resolution No. 69, which "authorizes the Parish Administrator, assisted by the Parish Legal Staff, to pursue any and all legal means to remove the monument from the Caddo Parish Courthouse Square." [Doc. No. 10-1 at 6].

I.      **Historical Background**

On July 1, 1835, a Treaty was made with the Caddo Indians whereby the United States would acquire the lands which today constitute Caddo Parish. [Doc. No. 38 at 2; *see also* Treaty With the Caddo, 7 Stat. 470 (1835)]. The second supplemental article of the Treaty "reserved to Larkin Edwards . . . one section of land to be selected out of the lands ceded to the United States by the said nation of Indians. . . ." *Id.* The foregoing "floating reservation" given to Edwards, which consisted of 640 acres and forms present day downtown Shreveport, included what later became known as Shreveport Block 23. [Doc. No. 90 at 6]. On January 24, 1836, Larkin Edwards entered into a promise to sell his floating grant to Angus McNeill for $5,000.00, on the condition that the Treaty between the United States and the Caddo "be confirmed by the Senate of the United States. . . ." [Doc. No. 90-1 at 14, 16].[2] On January 26, 1836, the Treaty with the Caddo was ratified by the United States Senate. *See U.S. v. Brooks*, 51 U.S. 442, 448 (1850).

In May of 1836, Angus McNeil and six other persons formed the Shreve Town Company. [Doc. No. 90 at 6; Doc. No. 90-1 at 12; *see also Pickett v. Brown*, 18 La.Ann. 560, 561 (La. 1866); *Akin v. Caddo Parish Police Jury*, 234 So.2d 203, 205 (La.App. 2 Cir. 1970)]. On May 27, 1836, McNeil sold and assigned to each of his partners an equal interest in the Edwards' reserve. [Doc. No. 90-1 at 12]. That Act of Sale states the reserve "has been located on Bennett and Cane's Bluff on the South Bank of Red River as will more fully appear by reference to a survey made by Grant A. Alexander, dated on the 16th of May, 1836, which tract or parcel of land has been laid out in lots for a town to be called SHREVE TOWN." [Doc. No. 90-1 at 12 (emphasis in original)]; *see also Akin* at 205; *City of Shreveport v. Walpole*, 22 La.Ann. 526, 527 (La. 1870); *Cane v. Battle*, 3 La.Ann. 642, 643 (La. 1848).

---

[2] *See also* Doc. No. 90-1 at 16 (noting the document reflecting the agreement was incorrectly dated January 24, 1835).

On February 4, 1837, Larkin Edwards executed an act under private signature whereby he nullified the former conveyance of his property to McNeil, acknowledged he had previously received $5,000.00 for the property, and then conveyed the property to the members of the Shreve Town Company.[3] The document further states:

> It is my intention and it is so understood between me and the purchasers above named to convey all the right, title, claim and pretensions which I now have by virtue of the above recited Treaty . . . and I do hereby warrant and will forever defend the above sold and described tract of land to the said purchasers, their heirs or assigns, against the claim or claims of all and every person or persons whomsoever. . . .

[Doc. No. 90-1 at 16]. Edwards further bound himself, his "heirs, executors, and administrators, to pass and sign an authentic Act of Sale of the above mentioned tract of land before any Notary or other public officer duly authorized to receive and record contracts in the said State whenever I or they shall be legally required so to do." *Id.* The instrument is signed by Edwards, McNeill, the six other members of the Shreve Town Company, and three witnesses. *Id.*; *see also Cane* at 643. On June 27, 1839, Edwards acknowledged the February 4, 1837 conveyance of his land to the Shreve Town Company before the Judge and Ex officio Notary Public for the Parish, as well as two witnesses, thereby causing his act under private signature to have "the same credit as an authentic act." LA. CIV. CODE art. 2239 (1825); [Doc. 90-1 at 16-17].[4] On December 14, 1841 (effective May 10, 1843), the Shreve Town Company was dissolved and it divided all remaining unsold lots by judicial partition. [Doc. No. 90 at 7 (citing *Pickett v. Brown*, 18 La.Ann. 560, 561 (La. 1866))]. Block 23 had not been sold prior to the partition, and "no former owners of the Shreve Town Company has ever claimed it." *Id.* at 8.

---

[3] Plaintiff interprets this document as Edwards nullifying the sale to the Shreve Town Company. *See e.g.* Doc. 90 at 7, 8. Plaintiff's interpretation is belied by the face of the document.

[4] Plaintiff contends Edwards never executed an authentic Act of Sale. *See e.g.* Doc. 90 at 7, 8. As set forth above, Plaintiff's position is belied by the evidence.

On January 18, 1838, the Parish of Caddo was created out of Natchitoches Parish. *Parish of Caddo v. Bossier Parish*, 113 So. 378, 381 (La. 1927); *Akin* at 205. On March 20, 1839, the town of Shreveport was created by the Louisiana Legislature. *City of Shreveport v. Walpole*, 22 La.Ann. 526, 528 (1870); *Police Jury of Bossier v. Corporation of Shreveport*, 5 La.Ann. 661 (La. 1850). Maps of "Shreve Town or the City of Shreveport show Block 23 dedicated as the Public Square from the late 1830s forward." [Doc. No. 90-4 at ¶ 1]. Since at least 1846, Caddo Parish has used block 23, City of Shreveport, for public purposes. [Doc. Nos. 38 at 2; 90-1 at 22, 24-27, 34, 37; *see also Akin* at 205]. The Caddo Parish Police Jury appropriated funds for the building of a Courthouse on Block 23 in 1856. [Doc. No. 90-1 at 27, 34]. The 1857 plat of the City of Shreveport shows Block 23 as designated for "Court House." [Doc. No. 12-1 at 4; Doc. No. 12-5]. A courthouse, maintained by Caddo Parish, has sat on the same property since at least 1860. [Doc. No. 38 at 2; Doc. No. 90-1 at 34, 37; Doc. No. 51 at 58].

In 1903, the Caddo Parish Police Jury granted permission to Plaintiff to place a Confederate Monument on the front plat of the Courthouse Square.[5] [Doc. No. 10-5]. The Minutes of the Police Jury reflecting the agreement read in pertinent part as follows:

> Mr. W.H. Wise on behalf of the Daughters of the Confederacy made an earnest appeal for an appropriating of $1000 for the Confederate monument, at the same time requesting that the monument association be given the front plat or portion of court house square as a site for the monument.
>
> Moved by J.S. Young that the $1000.00 be allowed and the front plat of court house square be reserved for that purpose, which motion was unanimously adopted.

[Doc. No. 10-5 at 1]. The monument has remained in that place until present day.

---

[5] The Caddo Parish Police Jury was the predecessor in interest of the Caddo Parish Commission.

## II.      Summary Judgment Standard

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Quality Infusion Care, Inc. v. Health Care Service Corp.*, 628 F.3d 725, 728 (5th Cir. 2010). As summarized by the Fifth Circuit:

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. However, where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.

*Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir.1994) (internal citations omitted).

When reviewing evidence in connection with a motion for summary judgment, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir.2001); *see also Feist v. Louisiana, Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (court must view all facts and evidence in the light most favorable to the non-moving party). "Credibility determinations are not part of the summary judgment analysis." *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002). Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof." *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004)(alterations in original)(quoting *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)).

### III.   Arguments of the Parties

#### A.      Defendant's Arguments

Defendant contends it owns the Courthouse Square by dedication, or alternatively, by acquisitive prescription, and therefore it has the authority to determine what monuments should be displayed in that public space. [Doc. No. 88-1 at 3, 8]. In support of its first position, Defendant submits: (1) "filings in Natchitoches and Caddo Parish," which Defendant argues show Larkin Edwards sold his tract to the Shreve Town Company, and therefore "maps of Shreveport showing this area dedicated to public use and not reserved for private ownership conform to what is evidenced by the deeds," *Id.* at 3; (2) the Minutes of the Caddo Parish Police Jury meeting held June 3, 1856, which reflect the Police Jury appropriated $10,000.00 "to build a court house and suitable offices for Caddo Parish" on Block 23, *Id.* at 4 (citing Doc. No. 88-4 at 10, 20); (3) a 2002 title opinion, which states maps from 1857 display the words "Court House" at Block 23, *Id.* (citing Doc. No. 10-6); (4) the Minutes of the Caddo Parish Police Jury meeting held January 3, 1860, which authorized the "building Court House Committee . . . to make certain changes in the Clerk's office in said building, . . . to let out contract for grading the public square and making side walks around same, and also to have a cistern constructed and gas fixtures put up in said Court House." *Id.* (citing Doc. No. 88-4 at 20); and (5) the testimony of Plaintiff's expert, Dr. Gary Joiner, who testified courthouses have sat on the property since the 1850s, and the square has consistently been maintained by Caddo Parish since that time. *Id.* (citing Doc. No. 51 at 58-59). Defendant argues

this evidence shows Block 23 was dedicated to public use by the Shreve Town Company, and Block 23 has been used for public purposes since at least the 1860s.

In support of its alternative position–that it acquired Block 23 by acquisitive prescription– Defendant argues, "Based on the fact that the public square was platted and publicly dedicated by Shreve Town Company and that Shreve Town Company bought the reservation from Larkin Edwards and thus wholly owned it, the Parish had just title and good faith as stated in the 1846 minutes." [Doc. No. 88-1 at 5]. Accordingly, Defendant contends it acquired the property by prescription of ten years in 1856. In the further alternative, Defendant contends it acquired Block 23 by prescription of thirty years in 1890. *Id.* at 5-6.

### B.    Plaintiff's Arguments

Plaintiff contends it acquired the plot of ground upon which the monument sits by acquisitive prescription, and therefore the Caddo Parish Commission cannot order removal of the monument (which Plaintiff also contends it owns) from Plaintiff's private property. While Plaintiff concedes Block 23 was originally dedicated to public use, it argues Defendant impliedly revoked the dedication by granting Plaintiff permission to place the monument on the front plat of the Courthouse Square. [*See e.g.* Doc. 90-4 at 3]. In support of this argument, Plaintiff submits the affidavit of its "expert Mr. Wayne Webb, attorney at law," who "reviewed conveyance records for Caddo Parish, Louisiana, for the purpose of determining the existence of any document purporting to convey any sort of an ownership interest of the . . . [plot of land situated within Block 23] into the Shreveport Chapter 237 of the Daughters of the Confederacy. . . ." [Doc. No. 90 at 16; Doc. No. 99-5 at 4]. According to Mr. Webb, he found no evidence conveying any type of interest in the property to Plaintiff in the Caddo Parish conveyance records. *Id.* However, after reviewing a

matter "off record," namely the 1903 Minutes of the Caddo Parish Police Jury, Mr. Webb opined as follows:

> Based upon the foregoing, I am of the opinion that the action of the Caddo Parish Police Jury in 1903, in reserving a plot of ground for the Daughters of the Confederacy, may have taken the property out of the purview of use as a public square as set forth in the original plat filing, because use of the plot of ground was then for the endeavors of a private entity. Pursuant to R.S. 33:4178, the action of the police jury may have been tantamount to a revocation of the dedication, which would have caused the ownership to revert back to those who dedicated the land. Under those circumstances, the Daughters of the Confederacy would have been occupying the respective plot without the permission of the true owners, thereby causing acquisitive prescription to run in favor the [sic] Daughters of the Confederacy.

[Doc. No. 99-5 at 6].[6]

Plaintiff notes it "has possessed" the property underneath the monument since 1903, when the Caddo Parish Police Jury "donated $1,000.00 for the construction of the Confederate Monument and gave a plot of land 'in perpetuity' to [Plaintiff]."[7] [Doc. No. 90 at 3]. According to Plaintiff, although it "treated the Caddo Parish Police Jury's actions as an oral donation," it now concedes "the minutes are not an actual written conveyance," but argues they constitute "evidence that the Defendant had relinquished the dedication of said site for the public use for the Caddo Parish Courthouse for the Plaintiff's private use." *Id.* at 4. From the forgoing, Plaintiff concludes, "[t]here is no evidence that Caddo Parish owns Shreveport Block 23 in its entirety," and Plaintiff

---

[6] La. R.S. 33:4718 provides that "parish governing authorities . . . may revoke and set aside the dedication of all parks, public squares or plots dedicated to public use . . . , when such parks, public squares or plots have been abandoned or are no longer needed for public purposes." *Id.* at § 4718(A). The statute further provides, "Upon such revocation, the title to the land covered by and embraced in said parks, public squares or plots, shall revert to the person or persons who were the owners of such land at the time of the dedication, their heirs, successors or assigns." *Id.* at § 4718(B). The Court notes La. R.S. 33:4718 was not passed until 1958, subsequent to the action of the Police Jury allowing Plaintiff to place the monument on the front plat of the Courthouse.

[7] The words "in perpetuity" appear nowhere in the 1903 Minutes.

"acquired ownership of the land underneath the Confederate Monument via acquisitive prescription. . . ." [Doc. No. 90 at 2, 11].

Plaintiff additionally attacks Defendant's title, arguing Defendant did not acquire Block 23 by acquisitive prescription. According to Plaintiff, although Larkin Edwards "sold his reservation to Angus McNeil and seven other men who later formed the Shreve Town Company in 1836," on March 14, 1840, Larkin Edwards signed a document which declared that sale to be null and void." *Id.* at 11-12. According to Plaintiff, Edwards died in 1841 "without signing an authentic Act of Sale" for the property, "and therefore, he never conveyed Shreveport Block 23 to the [sic] Angus McNeil and the other owners of the Shreve Town Company."[8] *Id.* at 12. Based upon the forgoing characterization of the historical background, Plaintiff contends Defendant could not have acquired Block 23 by prescription of ten years, because it "does not possess a just title (i.e. legal and transferable title)," nor was Defendant's possession in good faith. *Id.*

Plaintiff further contends Defendant did not acquire Block 23 by prescription of thirty years, because "[t]he possession on which this prescription is founded must be continuous and uninterrupted during all the time; it must be public and unequivocal, and under the title of owner."[9]

---

[8] As previously noted, this is not a reasonable interpretation of the document cited by Plaintiff. Rather, that document shows on February 4, 1837, Edwards nullified his sale to McNeil, and then conveyed the property to the members of the Shreve Town Company by act under private signature. On June 27, 1839, he acknowledged his signature by notarial act. [Doc. No. 90-1 at 16-17].

[9] Plaintiff then states, "And since the Caddo Parish Police Jury is a parochial corporation, it must appoint a natural person to accept possession of Shreveport Block 23." *Id.* at 13. Plaintiff cites LA. CIV. CODE art. 439 (1870) for this position. However, article 439 does not support Plaintiff's argument. At oral argument, counsel cited the Court to LA. CIV. CODE art. 437 (1825) for this argument. This article likewise does not support Plaintiff's argument, as it applies to "[c]orporations unauthorized by law or by an act of the legislature." *Id.* Plaintiff has provided no evidence that the Caddo Parish Police Jury was an unlawful corporation or was not authorized by the legislature. Further, this argument does not appear to comport with the jurisprudence of Louisiana. *See e.g. City of New Orleans v. Carrollton Land Co.*, 60 So.2d 695, 698 (La. 1913) (formal dedication or formal acceptance by town authorities is neither necessary nor practicable); *Walpole*, 22 La.Ann. at 529 ("The objection of the defendant that no acceptance of the dedication is shown, and that it is incumbent upon the plaintiff to show such acceptance, is without merit. It is well settled, by repeated decisions, that a formal acceptance is not necessary.")

[Doc. No. 90 at 12-13 (quoting LA. CIV. CODE art. 3500 (1870))]. According to this argument, Defendant did not have "continuous and uninterrupted" possession, because "not one version of the Caddo Parish Police Juries had been in existence for the thirty (30) years needed for acquisitive prescription." *Id.* at 13. As argued by Plaintiff, the enactment of various versions of the Louisiana State Constitution resulted in the dissolution of the prior governing authorities of Caddo Parish and the creation of new governing bodies, and therefore, "there was an interruption of precarious possession and no tacking." [Doc. No. 90 at 14]. Plaintiff concludes, "Thus, without neither possession nor evidence that it did not have permission of the actual owner of Shreveport Block 23 prescription had never commenced." *Id.* at 13. In support of this argument, Plaintiff cites one case having no relevance to this issue[10], as well as various articles of various versions of the Louisiana State Constitution, none of which support this position and will not be addressed further. [Doc. No. 90 at 13-14].

## IV.   Pertinent Jurisprudence

One of the earlier cases addressing the formation of the town of Shreveport is *Pickett v. Brown*, 18 La.Ann. 560 (La. 1866). There, plaintiffs sued the City of Shreveport to recover three town lots they contended the city was illegally possessing. The lots were located between the river and the nearest street running along the river, in an area "constituting what is commonly called an 'open space.'" *Id.* at 561. The city contended the property belonged to it for public uses since incorporation of the city on March 20, 1839, having been dedicated to the city at that time by the company formed by Angus McNeil and others who laid out the town. *Id.* at 561. The plaintiffs contended the city had no title to the property, the particular lots sued upon were not necessary for

---

[10] *See New York Belting and Packing Company v. T.W. Jones*, 22 La.Ann. 530 (La. 1866).

public use, and the city had never appropriated the lots. *Id.* The Supreme Court set forth the law of dedication as follows:

> That the dedication of property for public uses may be inferred from facts and circumstances, which leave no reasonable doubt upon the mind of the intention of the owner to make such a disposition, we think there can be no question.
>
> . . . .
>
> . . . [T]here is no particular form necessary to a dedication of land to public use. All that is required is the assent of the owner of the land, and the fact of its being used for the purposes intended.
>
> . . . [N]either a deed nor a grantee is necessary in the matter of dedication of property to public uses.

*Id.* at 562, 563 (internal quotation marks omitted) (citing *City of Cincinnati v. The Lessee of White*, 31 U.S. 431, 432 (1832); *Municipality No. 2 v. Orleans Cotton Press*, 18 La. 122 (La. 1841)).[11]

In examining title to the disputed property, the Supreme Court noted when the Shreve Town Company was dissolved in 1843, all remaining unsold lots were divided by judicial partition among each of the co-proprietors. *Id.* at 561. The Court noted the partition was "made with great care and exactness," and "much care had been taken to ascertain all the unsold property belonging to the company within the incorporated limits of the city. . . ." *Id.* at 561, 562. The Court found no disposition was made of the property at issue in the partition, the company had never exercised any act of ownership over the disputed property, and no evidence showed the company had ever intended to assert a claim over the property. *Id.* at 562. The court ultimately concluded the Shreve Town Company "intended to dedicate the public place in that town lying between Commerce street and the river, to public uses," as "[a]ll conditions required by the authorities we have noticed, to

---

[11] The requirements of an implied dedication are the same under current law. Such a dedication "requires an unequivocally manifested intent to dedicate on the part of the owner and an equally clear intent to accept on the part of the public." *Cenac v. Public Access Water Rights Ass'n*, 851 So.2d 1006, 1011 (La. 2003).

render a dedication complete, seem to us to be fulfilled in this case." *Id.* at 563. Accordingly, it decreed the property in dispute belonged to the city for public uses. *Id.*[12]

In *Akin v. Caddo Parish Police Jury*, 234 So.2d 203 (La.App. 2 Cir. 1970), residents of the City of Shreveport and the Parish of Caddo sought to enjoin the Caddo Parish Policy Jury from proceeding with plans to enlarge the parish courthouse and removing certain live oak trees encircling same. The court found the following historical facts were established at the trial of the case: In 1836, the Shreve Town Company had a map or plat recorded of present day downtown Shreveport. *Id.* at 205. The property was divided into sixty or more blocks, each of which was subdivided into lots "except Block 23, designated on the plat as a 'public square,' which was left intact." *Id.* At that time, the area was a part of Natchitoches Parish, out of which Caddo Parish was created in 1838. The town of Shreveport was created in 1839, and its boundaries were "coextensive with the boundaries shown on the plat of 1836." *Id.* In 1846, a jail was erected by the Caddo Parish Police Jury on the southwest corner of Block 23, and "[s]ince that time the square has been continuously under the administration of the Caddo Parish Police Jury. . . ." *Id.* A courthouse was erected by the parish upon the square in 1860, and there has been a courthouse on that block since that time. "In addition to serving as a site for a courthouse, the 'square' is frequently and incidentally used, and has been so used for many years, for public meetings of various kinds–

---

[12] *See also Walpole*, 22 La.Ann. 526 (finding Block 70, lying in the open space between Commerce Street and the river, was dedicated to the city for public use by the founders of the city, and the fact that no acceptance of the dedication was shown was irrelevant, as formal acceptance is not required; property dedicated to public use is inalienable); *McNeil*, 34 La.Ann. 1090 (finding lots within the "open space" of the City of Shreveport had been dedicated to public use by the Shreve Town Company by virtue of the fact it was not divided among the owners of the corporation by the judicial partition, and "title thereto was vested in the municipal corporation for such purposes, [which] ought not lightly to be disturbed, even if they were erroneous. . . .").

political, patriotic, and otherwise, such as sports pep rallies, art shows, concerts, et cetera. These used [sic] have not interfered with the use of the square or the courthouse." *Id.* at 205.

The court then found the exceptions of no right of action and no cause of action should have been sustained, absent any allegation or showing that plaintiffs had any interest different from that of the public generally. However, because the matter involved "an action affecting a public interest, that is, the orderly administration of an important local governmental function," the court addressed the merits of the issues presented as follows:

> The courthouse square, known as Block 23, constitutes public property. A primary issue, therefore, relates to a question of its control, administration, and management. Obviously, public property, to serve the purposes intended for it, must be under the jurisdiction of some authority. When the plat for the townsite was prepared and filed for record, the police jury governing the area was the only local governing authority in existence. . . .
>
> . . . .
>
> The Caddo Parish Police Jury has, as a fact, exercised jurisdiction and control over and has administered the 'public square' for 124 years as a location for public buildings. . . .
>
> The title of the property having been dedicated to the public, the governing authority, which, at the time, was the police jury representing the parish, continues in the public represented by the parish and not in a lesser segment of the public. . . . To hold otherwise would be to deprive a larger segment of the public of the use and enjoyment of the property and to place it in only a smaller segment of the public represented by the municipality.
>
> . . . .
>
> Thus, it must be concluded . . . that the police jury has jurisdiction and control over and has actual possession and administration of the property; that such administration and control are exercised in the interest of and for the service and benefit of the public in compliance with its obligation to provide and maintain a courthouse for the parish [under La. R.S. 33:4713].

*Id.* at 208-09 (citations omitted).

In *Police Jury of Plaquemines v. Foulhouze*, 30 La.Ann. 64 (La. 1878), certain judgment creditors of the Parish of Plaquemines issued execution, seized and advertised for sale a tract of land held by the parish. *Id.* at 65. The property had previously been donated "to the inhabitants of the parish of Plaquemines" by an *inter vivos* act of donation in 1846, and it was accepted on behalf of the citizens by the Plaquemines Police Jury. *Id.* The donation was made "on the express condition that said inhabitants shall build and erect the Court House of the aforesaid parish" on the property. *Id.* Thereafter, a courthouse and jail were erected on a portion of the tract fronting the Mississippi river. In 1875, the parish leased the rear portion of the tract to a rice farmer. It was this rear portion which was seized by the judgment creditors. *Id.* The parish obtained an injunction against the sale "on the ground that the same had been dedicated to public use and was '*hors de commerce*.'" *Id.* at 66.

On appeal, the Louisiana Supreme Court found the property was dedicated to public use, and therefore could "not be the subject of private ownership." *Id.* Such property "is out of commerce, and not liable to seizure." *Id.* Such property is held by a governmental body in trust for the public use, and the governing body has no authority "to dispose of property of a public nature, in violation of the trusts upon which it is held, nor of the public squares, streets or commons." *Id.* The court then found:

> We see no significance whatever in the fact that the whole of the donated tract is not in actual public use. It suffices that the public has a right to use. Nor does the fact that the part seized was cultivated in rice in 1875, under lease from the parish, operate to deprive the public of its rights of use. We have just seen that the parish can not directly or indirectly divest the property of its public character. How much of said property is or is not needed for the use of the public, is not, in its nature, a judicial question. It suffices for us to know that the public *has a right* to the use of *the whole*, and, for aught we can know, may have some day *necessity* for its use. Fifty years hence the Court House and jail may be, by encroachments of the river, driven to what is now the rear arpent of the tract. But these are considerations with which this Court has nothing to do. We must ascertain and enforce the rights of parties–which are governed by the law and not by the river.

*Id.* at 67 (emphasis in original); *see also Cook v. City of Opelousas*, 4 La.App. 300, 303-04 (La.App. 1 Cir. 1925) (open public use of greater part of length of dedicated street, "like corporeal possession of a part of a tract of land, under title calling for an entire tract, constitutes acceptance for its entire length as indicated on the plan by which it was created.")

## IV.   Analysis

### A.   As property dedicated to public use, the Caddo Parish Commission has the right to control, administer and manage Block 23

The parties and this Court agree Block 23 was impliedly dedicated to public use when the town of Shreveport was first laid out by the Shreve Town Company, thereby resulting in a servitude of public use. [Doc. No. 90-4 at 1, 3; Doc. No. 90 at 2; *see also Pickett*, 18 La.Ann. at 562; *Walpole*, 22 La.Ann. at 527-28; *Cane*, 3 La.Ann. at 643]. At that time, the only governing authority in the area was the parish police jury. *Akin* at 205, 208. Accordingly, the Court finds Block 23 was to be held by the governing body of Caddo Parish in trust for public use.

Once the dedication of Block 23 as a public square was accepted by public use, Block 23 became a public thing. *See* LA. CIV. CODE art. 450; *Coliseum Square Ass'n v. City of New Orleans*, 544 So.2d 351, 353 (La. 1989). "Public things, being insusceptible of private ownership, are inalienable, imprescriptible and exempt from seizure." *Band v. Audubon Park Com'n*, 936 So.2d 841, 845 (La.App. 4 Cir. 2006); *see also Coliseum Square* at 353 ("Such property, held as a public trust, is inalienable while it is being used by the public"). The fact that the Parish Police Jury allowed Plaintiff to place a monument in front of the courthouse does not operate to deprive the public of its rights of use. S*ee e.g. Pickett* at 562 (whether certain portion of property dedicated to public was or was not necessary for public use was irrelevant; "[i]f the original owners had dedicated the entire open space for public uses, it is not material to inquire to what uses it is

subjected"); *Foulhouze* at 67 (finding "no significance whatever in the fact that the whole of the donated tract is not in actual public use); *Coliseum Square* at 354 ("A thing may be in use without being necessary in the sense of being essential or indispensable."); *Cook* at 303-04. Accordingly, the Court finds no part of Block 23 is susceptible of private ownership, absent a revocation of the dedication. *McNeil v. Hicks*, 34 La.Ann. 1090, 1093 (La. 1882).[13]

Prior to passage of La. R.S. 33:4718 in 1958, municipalities and parish governmental authorities could not transfer public property for private purposes absent express legislative authority from the State. *See e.g. City of New Orleans v. Louisiana Soc. For Prevention of Cruelty to Animals*, 85 So.2d 503, 507-08 (La. 1955); see also LA. CONST. art. 58 (1858). In other words, a revocation of a dedication of property to public use required express permission of the sovereign. *McNeil* at 1093. Further, an implied dedication was terminable only "by formal revocation, relocation or abandonment." *Collins v. Zander*, 61 So.2d 897, 899 (La.App. Orleans 1952). As there is no evidence in the record showing the Caddo Parish Police Jury obtained express legislative permission to transfer the plot of ground to Plaintiff at any time prior to erection of the monument, and because there is no evidence in the record showing any "formal revocation, relocation or abandonment" of Block 23 as a public square, the Court finds the actions of Defendant, in reserving the front plot of ground for placement of a monument, did not constitute a revocation of the dedication. Because the Court finds the Parish did not revoke the dedication of Block 23, Plaintiff could not, as a matter of law, acquire the property at issue by acquisitive

---

[13] Because Plaintiff had permission of the Parish of Caddo to place the Confederate Monument on the front plat of the Courthouse Square, to the extent Plaintiff gained any interest in the plot of ground upon which the monument was placed, the Court finds Plaintiff gained precarious possession of same. *See* LA. CIV. CODE art. 3437 (2018); *Id.* at comment (a). Precarious possessors cannot acquire property by acquisitive prescription. LA. CIV. CODE art. 3510 (1870).

prescription. Accordingly, Plaintiff has no private property interest in the plot of ground upon which the Confederate Monument sits. [14]

### B.   Constitutional Claims

Plaintiff asserts its rights under the First, Fifth and Fourteenth Amendments to the United States Constitution were violated by Defendant's passage of Resolution No. 69. [Doc. No. 58 at 2]. Defendant contends because the property was dedicated to public use, it holds the property upon which the Confederate Monument sits in trust for the public, and therefore Plaintiff's Constitutional claims fail. [Doc. No. 88-1 at 8].

According to Plaintiff, Resolution No. 69 "constitutes an unconstitutional taking of Plaintiff's property in violation of the Fifth Amendment," because Defendant has not provided Plaintiff with "just compensation." [Doc. 90 at 24]. The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides that "private property" shall not "be taken for public use, without just compensation." *Chicago B. & Q.R. Co. v. Chicago*, 166 U.S. 226, 239 (1897); *Lingle v. Chevron USA, Inc.*, 544 U.S. 528, 536 (1995). It is well-settled that the framework of state law governs "what is a property interest compensable under the Fifth Amendment." *U.S. v. 131.68 Acres of Land*, 695 F.2d 872, 875 (5th Cir. 1983); *Fee v. Herndon*, 900 F.2d 804, 810 (5th Cir. 1990); *Hatfield v. Scott*, 306 F.3d 223, 226 (5th Cir. 2002). Insofar as Plaintiff alleges its Fifth

---

[14] Indeed, the Court finds the 1903 Minutes of the Caddo Parish Police Jury are more indicative of a dedication of the monument to the Parish in its public capacity, than they are of some type of conveyance of a property interest to Plaintiff. *See e.g. McGraw v. City of New Orleans*, 215 So.3d 319, 332 (La.App. 4 Cir. 2017) ("We do not hesitate to conclude that the monuments at issue are public things given that the undisputed evidence establishes clearly that they were erected on public property, owned by the City in its public capacity, and subsequently dedicated to the public use."); *State ex rel. Singlemann v. Morrison*, 57 So.2d 238, 241 (La.App. Orleans 1952) ("The doctrine is now generally recognized that the reasonable use of public money for memorial buildings, monuments and other public ornaments, designed to inspire sentiments of patriotism or of respect for memory of worthy individuals is for a public purpose). While Defendant briefly raised this argument in its earlier briefing [*see* Doc. 38 at 15], it has not pursued that argument in this motion.

Amendment rights were violated by a "taking" of the ground upon which the monument sits, for the reasons set forth above, the Court finds Plaintiff has not met its burden of showing that it had any private property interest in the front plat of the courthouse. *See e.g. Dorn v. International Broth. Of Elec. Workers*, 211 F.3d 938, 948 (5th Cir. 2000).

Plaintiff further appears to assert an unconstitutional "taking" with regard to the anticipated removal of the monument itself, when it argues, "Defendants' Resolution No. 69 does not provide for any funding to compensate Plaintiff for the cost of removal, damages to the Confederate Monument, and proper storage of the said monument," and further argues because the resolution "does not provide for taxpayers' monies to pay for the removal," Plaintiff will be required "to bear the costs of removal, storage, and damages to the Confederate Monument." [Doc. No. 90 at 23]. Assuming the Confederate Monument remains Plaintiff's private property, the Court finds this claim fails for the same reason provided in its Ruling on Plaintiff's application for a preliminary injunction–namely, that Plaintiff has presented no evidence that the Commission intends to compel it to bear the burden and cost of removal. Accordingly, the Court finds Plaintiff's claim under the Fifth Amendment fails.

Plaintiff argues its rights under the Fourteenth Amendment were violated, because "no procedural safeguards were in place to allow the Plaintiff to contest the removal of the Confederate Monument." [Doc. No. 90 at 22]. The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." To have a protected property interest within the contours of the Fourteenth Amendment, one must have some legitimate claim of entitlement to it, and "the sufficiency of the claim of entitlement must be decided by reference to state law." *Blackburn v. Marshall*, 42 F.3d 925, 936 (5th Cir. 1995) (quoting *Bishop v. Wood*, 426 U.S. 341, 344 (1976)). As discussed above, Plaintiff has failed to show it has a legitimate

property interest sufficient to require Fourteenth Amendment protection. Nevertheless, even assuming Plaintiff did have a sufficient property interest, the Fourteenth Amendment requires that states follow fair procedures before depriving citizens of their property. Ordinarily, this requires that the affected individual be given notice of the anticipated deprivation and a fair opportunity to challenge its propriety. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950). In this matter, there was a public hearing held prior to the passage of Resolution 69. [Doc. No. 12-3]. Further, the president of Shreveport Chapter #237 of the United Daughters of the Confederacy was a member of the advisory committee which studied this issue for over a year prior to the passage of the Resolution. [Doc. No. 12-6 at 13-14]. Accordingly, the Court finds Plaintiff had adequate notice and opportunity to be heard on the issue of removing the monument.

With regard to the First Amendment, Plaintiff asserts: "Defendants restricted the Plaintiff's First Amendment rights on the Plaintiff's privately owned property without providing . . . an alternative channel for communication of the information" [Doc. No. 90 at 17]; Defendant's regulation of Plaintiff's First Amendment rights from its' [sic] own private property . . . did not leave Plaintiff an ample alternative means to communicate its' [sic] message since there can only be one location for the spot where the last flag flew from a Confederate capital [sic]" *Id.* at 18; and "Defendants' decision does not provide for any alternative for the Plaintiff to express either its' [sic] speech or beliefs." *Id.* at 19. As previously discussed, the Court finds Plaintiff has no protected property interest in the plat of ground upon which the monument sits.

To the extent Plaintiff argues its free speech rights have been violated by removal of the monument on property dedicated to public use, the Court likewise finds Plaintiff's claim fails. "[T]he placement of a permanent monument in a public park is best viewed as a form of government speech and is therefore not subject to scrutiny under the Free Speech Clause."

*Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 464 (2009). "A government entity has the

right to speak for itself," and it is "entitled to say what it wishes." *Id.* at 467 (internal quotation

marks omitted). As stated in *State ex rel. Singelmann v. Morrison*:

> No individual or private association has the right to erect a memorial on public
> property without the consent of the governing authorities. . . .
>
> If any community in Louisiana has too many heroes to honor, or if memorial
> plaques should become plagues on its public buildings, the local authority could
> require their removal and prohibit their future erection.

57 So.2d 238, 244-45 (La.App. Orleans 1952). Because the placement of permanent monuments

in public parks is not subject to scrutiny under the First Amendment, and because Plaintiff makes

no argument that the Commission has made any effort to abridge any traditional free speech rights

(*i.e.*, the right to speak, distribute leaflets, etc.) that may be exercised by Plaintiff and others in the

Caddo Parish Courthouse Square, the Court finds Plaintiff's First Amendment claim fails.

**V.     Conclusion**

For the reasons set forth above, the Court finds Plaintiff has failed to carry its burden and

show there is an issue of material fact warranting trial. Accordingly, Defendant's Motion for

Summary Judgment [Doc. No. 88] is GRANTED, and Plaintiff's claims are DISMISSED WITH

PREJUDICE at Plaintiff's cost.

MONROE, LOUISIANA, this 25th day of July, 2018.

**ROBERT G. JAMES**
**UNITED STATES DISTRICT JUDGE**